## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| VERMONT ALLIANCE FOR ETHICAL HEALTHCARE, INC.; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>WILLIAM K. HOSER, in his official capacity as Chair of the Vermont Board of Medical Practice; MICHAEL A. DREW, M.D., ALLEN EVANS, FAISAL GILL, ROBERT G. HAYWARD, M.D., PATRICIA HUNTER, DAVID A. JENKINS, RICHARD CLATTENBURG, M.D., LEO LECOURS, SARAH McCLAIN, CHRISTINE PAYNE, M.D., JOSHUA A. PLAVIN, M.D., HARVEY S. REICH, M.D., GARY BRENT BURGEE, M.D., MARGA S. SPROUL, M.D., RICHARD BERNSTEIN, M.D., DAVID LIEBOW, D.P.M., in their official capacities as Members of the Vermont, Board of Medical Practice; JAMES C. CONDOS, in his official capacity as Secretary of State of Vermont; and COLIN R. BENJAMIN, in his official capacity as Director of the Office of Professional Regulation,<br><br>    Defendants. | Civil Action No. 5:16-cv-205 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

STATE OF VERMONT

WILLIAM H. SORRELL
ATTORNEY GENERAL

By:    /s/ Bridget C. Asay
       Bridget C. Asay
       Solicitor General
       Benjamin Battles
       Assistant Attorney General
       Office of the Attorney General
       109 State Street
       Montpelier, VT 05609-1001
       (802) 828-5500
       bridget.asay@vermont.gov
       benjamin.battles@vermont.gov

# CONTENTS

Introduction ...................................................................................................................1

    Act 39 .......................................................................................................................1

    Plaintiffs' Allegations ..............................................................................................3

Argument ......................................................................................................................6

I.     Plaintiffs lack standing because they have not plausibly alleged an injury
       or threatened injury caused by defendants ..........................................................7

    A.     Plaintiffs do not plausibly an injury-in-fact caused by defendants .........................7

    B.     Claims against the Secretary of State and Director must be dismissed,
            because plaintiffs have not made sufficient allegations of injury regarding
            osteopaths, pharmacists, or nurses ........................................................................11

II.    The complaint fails to state a plausible claim for relief under federal law. .......................13

    A.     Act 39 does not infringe plaintiffs' federal constitutional rights. .........................13

    1.     Plaintiffs have not stated a plausible free-speech claim, because any limited
            obligation imposed by Act 39 is a permissible regulation of the medical
            profession ..............................................................................................................13

    2.     Because Act 39 is a generally applicable law not targeted at religious practices,
            plaintiffs have not plausibly alleged a violation of the Free Exercise Clause .......16

    3.     The complaint fails to state a plausible due process claim. ...................................18

    B.     Even if those statutes apply, there is no private right of action to enforce
            plaintiffs' claims under the Church Amendments or the Affordable Care Act. ....19

    1.     Plaintiffs may not enforce 42 U.S.C. § 18113 through this private suit ..............19

    2.     The Church Amendments do not apply and are not enforceable
            by plaintiffs .............................................................................................................21

    C.     The relief sought is overbroad and unsupported by plaintiffs' claims..................24

III.   All state-law claims are barred by sovereign immunity. ....................................................24

Conclusion ..................................................................................................................25

In 2013, Vermont passed a law that gives willing patients and doctors an option when a patient is terminally ill: when requested by a patient, and when certain steps are followed, a doctor may prescribe medication that the patient may self-administer to hasten death. *See generally* Patient Choice at End of Life, 2013 Vt. Acts & Resolves, No. 39 (Act 39) (codified at 18 V.S.A. §§ 5281-5293). No one, patient or provider, is forced to participate in this process. "A physician, nurse, pharmacist, or other person shall not be under any duty, by law or contract, to participate in the provision of a lethal dose of medication to a patient." 18 V.S.A. § 5285(a). The Legislature recognized that Vermonters have deeply held and conflicting views on this difficult subject. Contrary to plaintiffs' claims, the law does not require any health care provider to counsel patients about hastening their death, provide medication that can be used to hasten death, or refer patients to doctors who will do so.

Accordingly, plaintiffs' claims should be dismissed. Plaintiffs challenge requirements that do not exist, and object to practices they have no obligation to carry out. They allege no injury sufficient to support standing and their claims fail as a matter of law.

## INTRODUCTION

*Act 39*

Act 39 allows a willing doctor, following specific guidelines, to prescribe medication to a terminally ill patient that the patient may self-administer to hasten death. 18 V.S.A. § 5283(a). The patient must make a voluntary, capable, informed request. *See id.* The physician—and only physicians may prescribe under Act 39—must document the patient's request and affirm that the law's other requirements were met. *Id.* Among other things, § 5283(a) provides that:

- the patient's oral request must be confirmed in writing, before witnesses who attest that the patient appeared to understand and be free from duress or undue influence;

- the patient must be capable, making an informed decision, and not have impaired

judgment;

- a second physician must confirm the patient's terminal prognosis and confirm that the patient is capable and making a voluntary decision; and

- the patient must be informed of treatment options, end-of-life services, and potential risks of taking the medication.

Act 39 is designed not to promote a particular viewpoint but to remove legal obstacles that prevented terminally ill patients from having this end-of-life choice. Without Act 39, a physician who intentionally prescribed medication for a patient to use to hasten death (as opposed to use for easing pain) risked liability, criminal charges, or professional sanctions. Act 39 changed that. Now, where the required steps are followed and the medication is self-administered by the patient, a physician may act without risk of prosecution or sanction. *Id.* Contrary to plaintiffs' allegations, the Act does not suggest that "assisted suicide is indicated" for terminally patients nor does it require any "ideological" statements. *See* Compl. ¶ 62. It merely provides a choice.

Several provisions of the statute protect health care providers who object to participating in the Act 39 process. Individual providers have no obligation to participate: a "physician, nurse, pharmacist, or other person shall not be under any duty, by law or contract, to participate in the provision of a lethal dose of medication to a patient." 18 V.S.A. § 5285(a). "A health care facility or health care provider shall not subject a physician, nurse, pharmacist, or other person to discipline, suspension, loss of license, loss of privileges, or other penalty for . . . refusals to act under this chapter." *Id.* § 5285(b). A health care facility "may prohibit a physician from writing a prescription for a dose of medication intended to be lethal for a patient who is a resident in its facility and intends to use the medication on the facility's premises, provided the facility has notified the physician in writing of its policy." *Id.* § 5286. The law further provides that it "shall

not be construed to conflict with" a provision of the Affordable Care Act that bars funding recipients from discriminating against individuals and health care entities that do not provide items or services for the purpose of assisting suicide. *Id.* § 5292; *see also* 42 U.S.C. § 18113.

Act 39 also addresses a patient's right to information about terminal care and answers to specific questions, and provides that physicians may engage in conversations about the Act 39 process without risk of liability:

> The rights of a patient under section 1871 of this title to be informed of all available options related to terminal care and under 12 V.S.A. § 1909(d) to receive answers to any specific question about the foreseeable risks and benefits of medication without the physician's withholding any requested information exist regardless of the purpose of the inquiry or the nature of the information. A physician who engages in discussions with a patient related to such risks and benefits in the circumstances described in this chapter shall not be construed to be assisting in or contributing to a patient's independent decision to self-administer a lethal dose of medication, and such discussions shall not be used to establish civil or criminal liability or professional disciplinary action.

18 V.S.A. § 5282. One of the cross-referenced statutes, 18 V.S.A. § 1871, is the "patient's bill of rights for palliative care and pain management."

### *Plaintiffs' Allegations*

Plaintiffs, two organizations of healthcare professionals, oppose "physician assisted suicide." Compl. ¶¶ 7, 12. They identify as members two Vermont physicians, a nurse, and an unnamed pharmacist. *Id.* ¶¶ 14, 15, 17, 18. They have sued, in their official capacities, members of the Vermont Board of Medical Practice, the Secretary of State, and the Director of the Office of Professional Regulation. The Board of Medical Practice regulates physicians. The Office of Professional Regulation, as part of the Secretary of State's office, regulates other healthcare providers, including nurses, pharmacists, and osteopaths.

The crux of plaintiffs' claim is that Act 39 "require[s] Plaintiffs' members to promote the State's views that physician assisted suicide is indicated in all instances of 'terminal conditions'

and force[s] them to counsel patients for physician assisted suicide in violation of the right of conscience," with the threat of civil, criminal, or professional licensing sanctions. *Id.* ¶ 63. According to plaintiffs, the Act requires "ideological" statements of their members, including that "assisted suicide is indicated for all diagnoses of 'terminal' condition," and that "assisted suicide is morally appropriate for all diagnoses for 'terminal' condition." *Id.* ¶ 62.

Despite these allegations, plaintiff identify no statute, regulation, or other guidance from defendants that mandates physicians to counsel patients for assisted suicide or requires physicians to tell patients that assisted suicide is either medically "indicated" or "morally appropriate." A number of plaintiffs' allegations directly contradict the Act, for example:

- plaintiffs allege that "[n]othing in the Act limits liability for regulatory action or civil or criminal action for a conscientious failure or refusal to dispense the lethal dose," Compl. ¶ 58, but 18 V.S.A. § 5285(a) provides that no person has a duty to participate in providing a lethal dose of medication;

- plaintiffs allege, without any factual support, that "defendants and court officials construe" as intentional misconduct "conscientious refusal[] to participate in assisted suicide as the Act and associated statutes require," Compl. ¶ 43, but again, the statute does not require participation;

- plaintiffs allege that the Act "purports to relieve conscientious physicians . . . of any legal, moral, or ethical culpability for participating in the act of assisted suicide," Compl. ¶ 48, but the Act speaks only to legal obligations and liability—it does not attempt to impose moral or ethical views on anyone; and

- plaintiffs allege that the Act contravenes 42 U.S.C. § 18113, but the Act specifically requires that it be construed not to conflict with that statute, *see* 18 V.S.A. § 5292.

The complaint also includes a number of conclusory allegations regarding defendants' supposed enforcement actions, including that defendants have "recently determined to force conscientious doctors and other clinicians to counsel their patients for physician-assisted suicide, Compl. ¶ 1; that defendants "require all healthcare professionals to counsel for assisted suicide", *id.* ¶ 2; that defendants interpret Act 39 to "mandate that all health care professionals participate in the practice" of assisted suicide, *id.* ¶ 41; that defendants construe a "conscientious refusal" to participate as intentional "misconduct," *id.* ¶ 43; that defendants' "interpretation and enforcement of Act 39 and its associated statutes are imposing substantial burdens" and hardship on plaintiffs' members, *id.* ¶ 61, and generally, throughout the ten counts of the complaint, that defendants have administered, applied, construed or enforced Act 39 in ways that harm or burden plaintiffs. Yet, again, the complaint sets forth no specific, supporting allegations showing that defendants—the Board of Medical Practice, the Secretary of State, and the Director—have taken any steps to interpret or enforce Act 39, or have threatened any disciplinary action against plaintiffs' members.

The two statements that plaintiffs identify, even if they supported plaintiffs' claims, cannot reasonably be attributed to defendants. Plaintiffs rely on an alleged statement by the executive director of the Vermont Ethics Network. *Id.* ¶ 4. Although plaintiffs assert that the Vermont Ethics Network is "imbued by Defendants with authority to speak to the standard of care in Vermont," *id.*, they provide no legal or factual support for that conclusory assertion. Vermont Ethics Network is a private organization, not a state government entity, and its views may not be attributed to defendants. Plaintiffs also point to an "FAQ" posted by the Department of Health. *Id.* ¶ 3. That document was not prepared by or distributed by defendants. And the document itself

states that "information is provided as a courtesy and not intended as legal advice."[1] Although the Board of Medical Practice is established as an office within the Department of Health, the Commissioner of the Department does not oversee the Board's duties in investigating and determining charges of unprofessional conduct. *Compare* 18 V.S.A. § 1351(c)-(e) (commissioner's powers and duties over personnel and budget) *with id.* § 1353 (Board's authority to investigate and determine charges). Board members are appointed by the Governor, with the advice and consent of the Vermont Senate. *Id.* § 1351(a). The Vermont Supreme Court has repeatedly recognized the Board's role in determining the relevant standard of care in unprofessional conduct cases. *See, e.g., In re Chase*, 2009 VT 94, ¶ 6, 186 Vt. 355, 987 A.2d 924 ("we defer to determinations that require the Board to apply its expertise or weigh whether certain behavior violated the standard of care pertaining to unprofessional conduct"). The Department's FAQ does not purport to be, and is not, the Board's interpretation or application of Act 39. In any event, as explained below, the FAQ does not support plaintiffs' claims.

Plaintiffs' allegations misconstrue Act 39. They object to obligations that are not imposed on them. To the extent the Act imposes any obligation at all, it is, at most, to either provide accurate information to patients who ask or direct those patients to other sources of information about the Act 39 process. That minimal requirement is consistent with the professional obligations of physicians and does not violate the First Amendment or federal law.

## ARGUMENT

Plaintiffs' complaint should be dismissed for lack of standing and failure to state a claim and because the state-law claims are barred by sovereign immunity. In deciding a motion to dismiss, the Court accepts factual allegations as true, and draws reasonable inferences in favor of the non-

---

[1] Vt. Dep't of Health, Patient Choice and Control at End of Life Act, Frequently Asked Questions, http://healthvermont.gov/family/end_of_life_care/documents/Act39_faq.pdf .

moving party. *E.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). Conclusory allegations, however, are not accepted as true. *E.g., Iqbal*, 556 U.S. at 678; *Turkmen v. Hasty*, 789 F.3d 218, 233 (2d Cir. 2015). The complaint must set forth sufficient factual detail to state a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *Turkmen*, 789 F.3d at 233. Applying that standard, plaintiffs' allegations are inadequate and their claims should be dismissed.

## I. Plaintiffs lack standing because they have not plausibly alleged an injury or threatened injury caused by defendants.

All of plaintiffs' claims fail for lack of standing, because they do not plausibly allege any injury or threatened injury. Plaintiffs' proffered interpretation of Act 39 is not consistent with the language of the statute and has not been suggested or adopted by defendants. Further, plaintiffs' allegations against the Secretary of State and Director must be dismissed because plaintiffs have not set forth any cognizable allegations regarding osteopaths, pharmacists, or nurses.

## A. Plaintiffs do not plausibly allege an injury-in-fact caused by defendants.

Standing is a threshold constitutional requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). Plaintiffs must adequately allege (1) injury-in-fact that is (2) fairly traceable to the challenged actions of defendants and (3) redressable by the Court. *Id.* at 560. An injury-in-fact is the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quotations and citations omitted). Plaintiffs do not allege any actual injury suffered by their members. That is, they do not allege that defendants have threatened or taken any action against their members, or indeed have threatened or taken disciplinary action against any Vermont health care provider for refusing to participate in the Act 39 process. At best, then, plaintiffs presumably contend that they face an

imminent injury—that they risk some imminent consequence unless they change their conduct. But their allegations are inadequate to make this showing, for at least three reasons.

*First,* plaintiffs' allegations that defendants are interpreting and enforcing the law in a manner that burdens or harms plaintiffs' members are all conclusory, unsupported by specific factual allegations regarding conduct by defendants. *See, e.g.,* Compl. ¶¶ 1-2, 41, 43, 61, 67, 68, 70, 75, 78, 83, 85, 93, 100. Even at the pleadings stage, the burden is on plaintiffs to establish standing, and they "must allege that [they] face[] a direct risk of harm which rises above mere conjecture." *Baur v. Veneman*, 352 F.3d 625, 636 (2d Cir. 2003). "While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Id.* at 636-37. Plaintiffs essentially ask the Court to infer that the regulatory agencies—the Board of Medical Practice and the Office of Professional Regulation—would take disciplinary action against a health care provider who does not counsel terminally patients for assisted suicide or refer patients to other providers. Their conclusory allegations, however, fall far short of supporting that inference. They do not allege any statement made by, or action taken by, any of the named defendants that suggests the regulatory agencies are contemplating or would take disciplinary action in those circumstances.

The only specific factual allegations point to a statement from the Vermont Ethics Network and part of the Department's FAQ. As explained above, neither can reasonably be attributed to the defendants. *See supra* 5-6. Further, even if the Court considers the FAQ, *see* Compl. ¶ 3, it does not support plaintiffs' allegations. The FAQ does not mandate that physicians "promote the State's views" or "speak the State's message on the subject of assisted suicide." *See* Compl. ¶¶ 63, 67. It says nothing about counseling patients for assisted suicide and does not mandate

referrals for assisted suicide. Rather, it says that doctors unwilling to provide information about Act 39 either refer a patient *or* arrange for the patient to receive information. The FAQ also says that it is "not intended as legal advice" and twice repeats that participation by a health care provider in the Act 39 process is "voluntary."[2] Thus, even if the Court attributes the FAQ to defendants, it is insufficient to show an imminent risk of injury.

*Second*, plaintiffs fail to adequately allege a "chilling effect" on speech sufficient to support their First Amendment claim. They identify four Vermont practitioners as members, but do not specifically allege that these individuals have religious or other objections to participating in the Act 39 process. Compl. ¶¶ 14-18. Even assuming that point can be inferred, the complaint does not allege that defendants' actions "had some actual, non-speculative chilling effect" on the conduct or speech of these practitioners. *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2003). They allege "no actual effect on the exercise" of their members' First Amendment rights or any change in their behavior. *Id.* That is, beyond broad generalizations about harm and burdens, plaintiffs have not alleged that these Vermont practitioners have actually changed their practices to counsel patients for assisted suicide or that these practitioners have a reasonable, credible fear of disciplinary action if they do not change their practices. One particular allegation is telling: that "[i]t is *likely* that *if* CMDA's members are forced to inform patients of their right to physician assisted suicide in violation of their consciences, they *would leave* the profession or relocate from the State of Vermont." Compl. ¶ 13 (emphasis added). That is speculation, nothing more. Missing is any allegation that the identified practitioners *are* contemplating ending their Vermont practices because they legitimately fear disciplinary action.

---

[2] *See* Frequently Asked Questions, *supra* n. 1 ("Every step must be voluntary by both the patient and the physician."; "Participation by any health care professional is completely voluntary.").

*Third*, plaintiffs' proffered interpretation of Act 39 is incorrect and thus any fear of disciplinary action is unreasonable. *Cf. Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376 (2d Cir. 2000) (finding standing, even though state argued that challenged statute should be interpreted not to reach plaintiffs' activities, where plaintiff's interpretation was "reasonable"). Stripped of conclusory and unsupported allegations, the complaint at best alleges that the Act 39 process has been incorporated into 18 V.S.A. § 1871, the "Patient's Bill of Rights for Palliative Care and Pain Management." *See* Compl. ¶¶ 44-45. That latter statute, which predates Act 39, provides in relevant part that:

> (a) A patient has the right to be informed of all evidence-based options for care and treatment, including palliative care, in order to make a fully informed patient choice.
> (b) A patient with a terminal illness has the right to be informed by a clinician of all available options related to terminal care; to be able to request any, all, or none of these options; and to expect and receive supportive care for the specific option or options available.

18 V.S.A. § 1871. Palliative care is defined as "interdisciplinary care given to improve the *quality of life* of patients and their families facing the problems associated with a serious medical condition." 18 V.S.A. § 2(6) (emphasis added). The Act 39 process is not "palliative care" as that term is used in the patient's bill of rights—it is an option for hastening death, not medical treatment such as pain management that improves the quality of life. Nor did the Legislature deem the Act 39 process to be "terminal care" for purposes of § 1871(b). Act 39 does not give patients a "right" to "request" and "expect and receive" aid in dying from their health care provider, but, instead, expressly provides that health care providers and facilities are not obligated to participate in the Act 39 process. *See* 18 V.S.A. §§ 5285, 5286. Further, § 5283 sets forth in detail the information that a physician must provide to a patient considering the Act 39 process, including the "range of treatment options" and, for patients not in hospice, "all feasible end-of-life services, including palliative care, comfort care, hospice care, and pain control." *Id.*

§ 5283(a)(6). Those provisions show that the Legislature viewed end-of-life services, palliative care, and pain control as something different than the Act 39 process. And finally, § 5283 provides detailed and specific guidance about how a patient must make the request, what physicians must say to patients and what must be documented, recorded and witnessed—but nowhere does the statute say that a physician must inform every terminally ill patient of this option and counsel them about it, even if the patient has not mentioned it. If the Legislature in fact intended to create that affirmative duty, its absence from § 5283 is a glaring omission.

Plaintiffs point to § 5282, but that section does not say that physicians must inform and counsel all terminally ill patients about Act 39. At most, § 5282 provides that physicians should not withhold requested information or refuse to respond to patient inquiries. Act 39 removed legal obstacles that prevented physicians from offering terminally ill patients assistance in voluntarily hastening their deaths. The Act did not, however, equate aid-in-dying with palliative care or pain management, as an option that all clinicians must offer and provide to all patients.

In defendants' view, physicians do have a professional obligation to ensure that patients who inquire about aid-in-dying or the Act 39 process receive accurate information. Physicians may provide that information directly or, if they object to doing so, may take other steps to ensure that the patient receives information, through a referral to another provider, to an organization, or to written or online materials about the Act that are readily available to the patient. But that limited obligation is not what plaintiffs challenge here; they challenge a non-existent requirement that physicians and other providers "participate in assisted suicide." Compl. ¶ 43. Because defendants have not imposed such a requirement, plaintiffs lack standing to challenge it.

**B. Claims against the Secretary of State and Director must be dismissed, because plaintiffs have not made sufficient allegations of injury regarding osteopaths, pharmacists, or nurses.**

Plaintiffs have alleged no cognizable injury caused or threatened by the Secretary of State or Director of the Office of Professional Regulation. Their allegations are insufficient to support claims regarding providers regulated by that Office. Compl. ¶¶ 18, 21-22.

**Pharmacists.** Plaintiffs allege that their members include a "licensed pharmacist" who is "required by" the Secretary of State and Director "to dispense lethal medications and/or counsel and/or [] refer for assisted suicide." Compl. ¶ 18. No factual allegations amplify this bare assertion. Plaintiffs do not identify any rule, guidance, or other statement that places this "requirement" on pharmacists. And Act 39 provides that a pharmacist "shall not be under any duty, by law or contract, to participate in the provision of a lethal dose of medication to a patient." 18 V.S.A. § 5285(a). Plaintiffs have not adequately alleged that the single pharmacist member they identify has suffered any cognizable injury because the pharmacist does not wish to dispense a lethal dose of medication or counsel a patient about such a medication.

**Osteopaths.** Plaintiffs have not alleged that a licensed Vermont osteopath is a member of either organization. Without a member potentially affected by the regulation of osteopaths, plaintiffs lack standing to pursue the claim.[3] *See, e.g., Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc*., 675 F.3d 149 (2d Cir. 2012) (an organization may sue on behalf of its members if, among other requirements, the members themselves have standing).

**Nurses.** Plaintiffs allege that one member is a registered hospice nurse who is "required by" the Secretary of State and Director to "counsel and/or refer" for assisted suicide. Compl. ¶ 17. Again, no supporting allegations are provided and plaintiffs have identified no action that the Secretary of State or Director have taken to impose this "requirement" on nurses. Nurses have no

---

[3] Osteopaths may prescribe a lethal dose of medication consistent with Act 39's standards and requirements. 18 V.S.A. § 5281(9). But even if plaintiffs could allege that some of their members are osteopaths, the claim still fails for lack of standing, for the reasons given in Part I(A).

authority to prescribe a lethal dose of medication under Act 39. And nurses who object to

participating in the Act 39 process are protected by §§ 5285(a) and (b). Plaintiffs have not

alleged any cognizable injury suffered by the nurse.

## II. The complaint fails to state a plausible claim for relief under federal law.

The Court should also dismiss plaintiffs' federal claims under Fed. R. Civ. P. 12(b)(6),

because they have not plausibly alleged a constitutional violation and the federal statutes they

rely upon—even if relevant— do not create a private right of action.

## A. Act 39 does not infringe plaintiffs' federal constitutional rights.

None of plaintiffs' constitutional claims withstand scrutiny. First, any limited obligation that

objecting physicians may have to direct a patient to information about Act 39 serves a

substantial, if not compelling, government interest and is a permissible regulation of the medical

profession. Second, the Act is a neutral and generally applicable law and does not violate the

Free Exercise Clause. Third, the Act does not violate plaintiffs' due process rights.

## 1. Plaintiffs have not stated a plausible free-speech claim, because any limited obligation imposed by Act 39 is a permissible regulation of the medical profession.

The First Amendment does not categorically bar speech-related regulations of physicians and

other professionals. "[T]he State has a significant role to play in regulating the medical

profession." *Gonzales v. Carhart,* 550 U.S. 124, 157 (2007). In *Planned Parenthood v. Casey,*

505 U.S. 833, 884 (1992), the plurality opinion rejected the argument that certain informed-

consent requirements for abortion violated the First Amendment: "To be sure, the physician's

First Amendment rights not to speak are implicated, but only as part of the practice of medicine,

subject to reasonable licensing and regulation by the State. We see no constitutional infirmity in

the requirement that the physician provide the information mandated by the state here." *Id.*

(plurality op.) (citations omitted). Several circuits have held, drawing on *Gonzales* and *Casey,*

that regulations of the speech of health care providers, at least in the context of the practice of medicine, are subject to lesser scrutiny. *See King v. Governor of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2016) (holding that "licensed professional does not enjoy the full protection of the First Amendment when speaking as part of the practice of her profession," providing "personalized services to a client based on the professional's expert knowledge and judgment"; applying intermediate scrutiny and upholding restriction on sexual orientation change therapy for minors); *Planned Parenthood Minn. v. Rounds,* 530 F.3d 724, 734-35 (8th Cir. 2008) (en banc) (holding that "while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion"); *Texas Medical Providers Performing Abortions v. Lakey*, 667 F.3d 570, 574-78 (5th Cir. 2012) (similar, concluding that *Casey* did not apply strict scrutiny and upholding required disclosures of "truthful, non-misleading information"); *Pickup v. Brown*, 740 F.3d 1208, 1227, 1228 (9th Cir. 2013) ("the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it"). The Second Circuit has likewise acknowledged in dicta that lesser scrutiny applies to the speech of licensed physicians. *See Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014).

A physician's obligation to provide patients information about Act 39, either personally or by directing them to another appropriate source of information, easily satisfies the First Amendment standards applied in these cases.

*First*, the degree of First Amendment protection is generally at its lowest where a State directly regulates the doctor-patient relationship. *See, e.g., King*, 767 F.3d at 232 (defining

"professional speech" as part of professional's "personalized services to a client," as distinguished from public communications or offering of personal opinions). Responding to a patient's inquiries with accurate information is part of the individual doctor-patient treatment relationship. As the Ninth Circuit explained, the First Amendment permits a substantial amount of speech regulation in this context, because "[w]hen professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate." *Pickup*, 740 F.3d at 1228. At most, the relevant standard is a form of intermediate scrutiny, and some courts have even suggested a lower standard. *See Lakey*, 667 F.3d at 575 (describing *Casey's* analysis as "the antithesis of strict scrutiny"); *but see Stuart v. Camnitz*, 774 F.3d 238, 249 (4th Cir. 2014) (disagreeing with *Lakey* and *Rounds* and holding that intermediate scrutiny applies).

*Second*, assuming intermediate scrutiny applies, the State has a legitimate and substantial interest in requiring physicians to answer patients' questions about the Act 39 process or to ensure that they are directed to another reasonably available source of information. *See, e.g., King*, 767 F.3d at 237 (applying intermediate scrutiny). A terminally ill patient has no choice but to look to his or her doctor for information and to understand their options. Allowing a doctor to ignore a patient's request for information or, worse yet, give inaccurate information would disserve the needs of a particularly vulnerable patient population. *Casey* itself recognized that disclosure and informed-consent requirements serve states' interests in regulating the practice of medicine. 505 U.S. at 884.

*Third*, requiring physicians to provide information when asked or ensure patients receive it from another source directly advances the State's interests and is narrowly tailored. *See King*, 767 F.3d at 238-39 (applying those standards). If a patient does not receive accurate information

from their doctor, they are unlikely to find it elsewhere and may be misled or confused about their options. And the burden placed on doctors is minimal: they do not have to recommend aid-in-dying, counsel about it, say that it is medically indicated, or refer a patient to a physician who will offer the service. All that is required is that, if asked, a physician truthfully tell a patient that state law provides this option for terminally ill patients and, if the physician does not wish to participate in the process or further discuss it, ensure that the patient is directed to a reasonably available source of information.

Indeed, this case is a far easier case than the abortion-related disclosure and informed-consent requirements upheld by other courts. As *Casey* and *Rounds* both implicitly recognize, those state-law informed-consent requirements, though held to be truthful and not misleading, were intended to influence a woman's choice to have an abortion. The Fourth Circuit recently struck down a requirement that, before a woman has an abortion, a physician must perform an ultrasound and, among other things, describe the fetus in detail. *Stuart*, 774 F.3d at 233, 256. That law, the Fourth Circuit reasoned, looked nothing like traditional informed consent and "render[ed] the physician the mouthpiece of the state's message." *Id.* at 254. Here, Vermont is not requiring physicians to deliver a message that encourages patients to make a particular choice. Far from it. The intent is only to ensure that patients have information about the options available to them, and are themselves able to make a voluntary and informed choice. And further, unlike the informed-consent requirement upheld in *Casey*, physicians are not necessarily required to personally provide information about Act 39, but may instead direct the patient to another provider willing to do so or to other readily available sources of information.

Plaintiffs have not alleged a plausible First Amendment speech claim.

**2. Because Act 39 is a generally applicable law not targeted at religious practices, plaintiffs have not plausibly alleged a violation of the Free Exercise Clause.**

Plaintiffs have not alleged a free-exercise violation. The "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990) (quotation omitted). Act 39 is a neutral law of general applicability. It provides immunity for physicians who, under specific circumstances, voluntarily choose to prescribe medication that a terminally ill patient may use to hasten death. 18 V.S.A. § 5283. The law does not refer to or target religious practices. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."). Nor does the law "in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543; *cf. Central Rabbinical Congress v. N.Y.C. Dep't of Health*, 763 F.3d 183, 193-96 (2d Cir. 2014) (holding that law prohibiting use of oral suction during circumcision targeted solely religious conduct and triggered strict scrutiny). And plaintiffs have not alleged, nor could they, that the law was motivated by an intent to suppress religious practices or discriminate against religious beliefs. *See* Compl. ¶¶ 72-79; *cf. Church of Lukumi Babalu Aye*, 508 U.S. at 533-39 (discussing record evidence of discriminatory intent).

Again, as explained above, participation in the Act 39 process is voluntary for doctors. Doctors are not obligated to counsel patients for assisted suicide or to participate in providing medication that patients would use for that purpose. Any obligation doctors may have to direct patients to information about Act 39 is neutral and generally applicable, and does not trigger heightened scrutiny under the Free Exercise Clause. Indeed, the outcome is the same even if the Court credits plaintiffs' allegations that the law requires "counseling" and "referrals" regarding

the Act 39 process. The Free Exercise Clause does not mandate religious exemptions for health care providers. *See, e.g., Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075-85 (9th Cir. 2015) (regulation requiring pharmacists to stock and offer emergency contraception, without religious exemption, is neutral and generally applicable and does not violate Free Exercise Clause), *cert. denied*, 136 S. Ct. 2433 (2016); *cf. Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (holding that exclusion of unvaccinated children from school during outbreak of vaccine-preventable illness does not violate parents' free-exercise rights).

Plaintiffs' description of their claim as involving "hybrid rights" does not change this analysis, because the Second Circuit does not apply any greater level of scrutiny to so-called "hybrid" claims. Rather, the Second Circuit has specifically rejected applying a "more stringent legal standard" to claims that rely on more than one constitutional provision. *See, e.g., Leebaert v. Harrington*, 332 F.3d 134, 143-44 (2d Cir. 2003). Some circuits have suggested that certain language in *Smith* calls for additional or "strict" scrutiny of hybrid claims. *See id.* (collecting cases); *Smith,* 494 U.S. at 881-82. The Second Circuit, however, has held that the relevant language in *Smith* is nonbinding dicta, and found "no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated." *Leebaert*, 332 F.3d at 144; *see also Knight v. Conn. Dep't of Pub. Health,* 275 F.3d 156, 167 (2d Cir. 2001) ("Appellants' reliance on *Smith* is misplaced, as the language relating to hybrid claims is dicta and not binding on this court."). That plaintiffs also assert a free-speech claim does not change the level of scrutiny applied to their free-exercise claim. *Leebaert*, 332 F.3d at 144.

**3. The complaint fails to state a plausible due process claim.**

The Court should dismiss plaintiffs' claim that the statute is unconstitutionally vague. A due-process vagueness challenge may be considered only in the light of facts specifically alleged by

plaintiffs. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-20 (2010). Plaintiffs allege that the statute is vague and thus allows defendants to require them to "counsel for assisted suicide." Compl. ¶ 83. As discussed above, the law imposes no such requirement, and defendants have not suggested it does. Plaintiffs also claim that other terms used in the statute are vague, but do not explain why any alleged ambiguity affects them, as they do not intend to participate in the Act 39 process. Compl. ¶ 82. In any event, the terms they identify are either defined in statute or reasonably within the understanding of a licensed physician.

**B. Even if those statutes apply, there is no private right of action to enforce plaintiffs' claims under the Church Amendments or the Affordable Care Act.**

In counts IV and V of their complaint, plaintiffs assert claims under 42 U.S.C. § 1983 for violation of two federal statutes—42 U.S.C. § 300a-7(d), a provision of the so-called "Church Amendments," and 42 U.S.C. § 18113(a), a provision of the Affordable Care Act. These claims should be dismissed because neither statutory provision may be enforced through a private right of action or § 1983. "[P]rivate rights of action to enforce federal law must be created by Congress." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014) (quoting *Alexander v. Sandoval,* 532 U.S. 275, 286 (2001)). "A federal statute may create a private right of action either expressly or, more rarely, by implication." *Id.* As for enforcing these laws through § 1983, the Supreme Court has allowed an action to proceed "only for violations of federal laws that 'manifest an unambiguous intent to confer individual rights.'" *Davis v. Shah*, 821 F.3d 231, 244 (2d Cir. 2016) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (alterations omitted)); *see also Gonzaga*, 536 U.S. at 289 n.7 (There is "no presumption of enforceability merely because a statute speaks in terms of 'rights.'") (quotation omitted).

**1. Plaintiffs may not enforce 42 U.S.C. § 18113 through this private suit.**

Plaintiffs do not have a right of action to enforce 42 U.S.C. § 18113, which was enacted as

part of the Affordable Care Act. That provision states that:

> The Federal Government, and any State or local government or health care provider that receives Federal financial assistance under this Act (or under an amendment made by this Act) or any health plan created under this Act (or under an amendment made by this Act), may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing.

42 U.S.C.A. § 18113(a). This provision fails to create a private right of action and is not enforceable under § 1983 because it neither creates any individual rights nor establishes any private remedies.

*First*, the statute fails to create any individual rights. "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander*, 532 U.S. at 289 (quotation omitted). Here, section 18113(a) "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating." *See id.* Accordingly, the statute reveals no congressional intent to confer a federal right on a special class to which the plaintiffs belong. *Cf. Briggs v. Bremby*, 792 F.3d 239, 242 (2d Cir. 2015) (holding certain time limits in Food Stamp Act to be enforceable through § 1983).

*Second*, there is also no indication that Congress intended to create a private remedy to enforce section 18113(a). The statute does not expressly provide for such a remedy and there is no other basis to imply one. Rather, the statute itself provides for an alternative enforcement mechanism—through HHS's Office of Civil Rights. 42 U.S.C. § 18113(d) ("The Office of Civil Rights of the Department of Health and Human Services is designated to receive complaints of discrimination based on this section."). *See George v. NYC Dep't of City Planning*, 436 F.3d 102, 103 (2d Cir. 2006) ("It is telling that the Act specifies a mechanism for enforcing the

consistency requirement against state and city agencies without mention of any private right of action."). Because § 18113(a) does nothing more than ban discrimination by recipients of federal funds, it does not create a right enforceable under § 1983. *See Gonzaga*, 536 U.S. at 287 (statute prohibiting federal funding of "any educational agency or institution" that "has a prohibited policy or practice" does not "confer the sort of *individual* entitlement that is enforceable under § 1983") (quotations omitted, emphasis in original); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690-93 (1979); *Cenzon-DeCarlo v. Mt. Sinai Hosp.*, 626 F.3d 695, 698-99 (2010).

In any event, plaintiffs have not plausibly alleged a violation of section 18113(a). As discussed above, there is no requirement that any of plaintiffs' members "provide any health care item or service" for the purpose of causing, or assisting in causing, a patient's death. *See* 42 U.S.C. § 18113(a). Moreover, Act 39 itself expressly provides that it "shall not be construed to conflict with" section 18113(a)*.* 18 V.S.A. § 5292.

**2.  The Church Amendments do not apply and are not enforceable by plaintiffs.**

Plaintiffs also cannot state a claim under 42 U.S.C. § 300a-7(d). That section is part of several "conscience provisions" known as the Church Amendments—named after former U.S. Senator Frank Church—which "were enacted at various times during the 1970s to make clear that receipt of Federal funds did not require the recipients of such funds to perform abortions or sterilizations." *Regulation for the Enforcement of Fed. Health Care Provider Conscience Protection Laws*, 76 FR 9968-02 (Feb. 23, 2011). Section § 300a-7(d) provides:

> **Individual rights respecting certain requirements contrary to religious beliefs or moral convictions**
> No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions.

42 U.S.C.A. § 300a-7(d). Plaintiffs have not plausibly alleged a covered program or research activity to which this statute applies. Nor, as explained above, does Act 39 even impose the "requirements" they challenge.

And even if this provision applies here, it cannot be enforced in a private lawsuit. Nothing in the text of § 300a-7(d) expressly creates a private right of action. Indeed, the Second Circuit has observed that none of the provisions of § 300a-7 "explicitly" creates "a right to sue." *Cenzon-DeCarlo v. Mt. Sinai Hosp.*, 626 F.3d 695, 696-97 (2010). Nor is there any reason to conclude that § 300a-7(d) is one of the "atypical" situations in which Congress intended to create a private right of action by implication. *Compare Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) (implying a private right of action under Title IX based on numerous indicia of Congressional intent).

In *Cenzon-DeCarlo*, the Second Circuit construed a different "conscience provision" in the same statute and concluded that it did not create a private right of action. That provision, 42 U.S.C. § 300a-7(c), prohibits federally-funded health care providers from, among other things, discriminating against "any physician or other health care personnel" who has a religious or moral objection to performing or assisting in a "lawful sterilization procedure or abortion." In the public law that enacted sections 300a-7(c) and (d), both provisions appear under the title "individual rights." *See* Pub. L. 93-348, § 214(A), 88 Stat. 342. The Court concluded, however, that there "is *no* evidence that Congress intended to create a right *of action.*" 626 F.3d at 698 (emphasis in original); *see also id.* at 698-99 ("Section 300 may be a statute in which Congress conferred an individual right without an accompanying right of action. We are not prepared to say that this is the case. . . . and we need not do so . . ."). Relying on *Cannon v. University of Chicago* and *Gonzaga University v. Doe*, the Second Circuit concluded that § 300a-7(c)'s ban on

discriminatory conduct, without more, did not create a private right of action. *Id.* at 698-99; *see also Cannon*, 441 U.S. at 690-93 (cautioning against implying a private right of action based on statutory language that simply banned "discriminatory conduct by recipients of federal funds" or prohibited "the disbursement of public funds" to entities that engaged in such discrimination); *Gonzaga*, 536 U.S. at 287 (declining to imply a private right of action under statute that prohibited disbursing federal funds to entity that "has a policy or practice of permitting the release of education records [to unauthorized entities]"). Similarly, § 300a-7(d), like the provision at issue in *Cenzon-DeCarlo*, places conditions on the receipt of federal funds. Congress did not intend it to create a private right of action.

Moreover, § 300a-7(d) does not contain the requisite "rights-creating" language to be enforced through § 1983. *See Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 149-50 (2d Cir. 2006). *First,* the granting of rights to any "individual" who may be involved with a federally-funded "health service program or research activity" fails to define a narrow class of beneficiaries to which plaintiffs' members belong. *See id. Second*, the asserted right—to never be required to do anything contrary to one's religious beliefs or moral convictions—is too "vague and amorphous" to be judicially enforced. *See id.* And *third*, the statute does not "unambiguously impose a binding obligation on the States." *See id.*

*Finally*, implying a private remedy under § 300a-7(d) would be inconsistent with the existing framework for enforcing the Church Amendments. In *Gonzaga*, the Supreme Court supported its decision not to imply a private right of action by noting the grant of authority to the Secretary of Education to enforce the statute's requirements, and by the regulatory framework the Secretary subsequently established for those purposes. Here, similarly, the Department of Health and Human Services has implemented a regulatory framework "to provide for the enforcement of the

Church Amendments." 45 C.F.R. § 88.1. Under that framework, HHS's "Office for Civil Rights . . . is designated to receive complaints" based on the Church Amendments and "will coordinate the handling of complaints with the Departmental funding component(s) from which the entity, to which a complaint has been filed, receives funding." 45 C.F.R. § 88.2. "These administrative procedures squarely distinguish this case from [those] where an aggrieved individual lacked any federal review mechanism and further counsel against . . . finding a congressional intent to create individually enforceable private rights." *Gonzaga*, 536 U.S. at 289-90 (citations omitted). *See also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005) (even when plaintiff demonstrates existence of an individual statutory right, the presumption of enforceability under § 1983 may be rebutted by a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983").

Accordingly, the Court should not imply a private a right of action under the Church Amendments, and should dismiss count IV of plaintiff's complaint.[4]

## C. The relief sought is overbroad and unsupported by plaintiffs' claims.

Even if plaintiffs asserted a plausible claim for relief, and they have not, the relief sought in the complaint is overbroad. They seek a declaration that Act 39 is facially invalid, and broad injunctive relief barring defendants from enforcing Act 39, 18 V.S.A. § 1871, and 12 V.S.A. § 1909. The latter two statutes have applications far beyond the aid-in-dying law, and even as to Act 39, plaintiffs have not asserted any claim that would support invalidating the law on its face.

## III. All state-law claims are barred by sovereign immunity.

Plaintiffs also allege violations of the Vermont Constitution (Counts VI-VIII), but these

---

[4] Even those who support a private right of action to enforce the Church Amendment's "conscience provisions" recognize that no such right currently exists. *See, e.g.*, Conscience Protection Act of 2016, S. 2927, 114th Cong. (2d Sess. 2016) (noting that the Church Amendments do not provide for a private right of action that allows discrimination victims to "defend their conscience rights in court").

state-law claims are barred by sovereign immunity. The *Ex parte Young* exception to sovereign immunity allows a court to order prospective injunctive relief against a state official solely to remedy an ongoing violation of federal law. *See, e.g., Quern v. Jordan*, 440 U.S. 332, 337 (1979) (under *Ex parte Young*, federal court "may enjoin state officials to conform their future conduct to the requirements of federal law"). The limited rule of *Ex parte Young* is "inapplicable in a suit against state officials on the basis of state law." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). As the Supreme Court reasoned in *Pennhurst*, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id*. Counts VI, VII, and VIII must be dismissed as barred by sovereign immunity.

Counts IX and X, which seek declaratory relief under state law, should also be dismissed. The state declaratory-judgment statutes cited in those counts are enabling acts for state superior courts and have no relevance to a lawsuit brought in federal court. *See* 12 V.S.A. § 4711 ("Superior Courts within their jurisdictions shall have power to declare rights, status, and other legal relations . . . . "); 3 V.S.A. § 807 ("validity or applicability of a rule may be determined in an action for declaratory judgment in the Washington Superior Court"). Section 807 also does not apply because plaintiffs do not challenge the validity or applicability of any state rule. *See* Compl. ¶¶ 128-134. In any event, to the extent plaintiffs allege that these state laws supply a cause of action or enlarge their rights, the claims are barred by sovereign immunity.[5]

## CONCLUSION

For the reasons given, plaintiffs' complaint should be dismissed.

---

[5] If in fact Counts IX and X merely restate the federal-law claims in Counts I-V (*see* Compl. ¶¶ 124, 129), the claims are duplicative and reliance on the state declaratory-judgment acts is improper.

Dated: September 25, 2016

STATE OF VERMONT

WILLIAM H. SORRELL
ATTORNEY GENERAL

By:    /s/ Bridget C. Asay        
Bridget C. Asay
Solicitor General
Benjamin Battles
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
bridget.asay@vermont.gov
benjamin.battles@vermont.gov

Counsel for Defendants Hoser, Drew,
Evans, Gill, Hayward, Hunter, Jenkins,
Clattenburg, Lecours, McClain, Payne,
Plavin, Reich, Burgee, Sproul,
Bernstein, Liebow, Condos, and Benjamin