UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| VERMONT ALLIANCE FOR ETHICAL HEALTHCARE, INC.; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS, INC., | Civil Action No. 5:16-cv-205 |
| *Plaintiffs,* | PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| WILLIAM K. HOSER, in his official capacity as Chair of the Vermont Board of Medical Practice; MICHAEL A. DREW, M.D., ALLEN EVANS, FAISAL GILL, ROBERT G. HAYWARD, M.D., PATRICIA A. HUNTER, DAVID A. JENKINS, RICHARD CLATTENBURG, M.D.,  LEO LECOURS, SARAH McCLAIN, CHRISTINE PAYNE, M.D., JOSHUA A. PLAVIN, M.D., HARVEY S. REICH, M.D., GARY BRENT BURGEE, M.D.   MARGA S. SPROUL, M.D., RICHARD BERNSTEIN, M.D., DAVID LIEBOW, D.P.M., in their official capacities as Members of the Vermont Board of Medical Practice; JAMES C. CONDOS, in his official capacity as Secretary of State of Vermont; and COLIN R. BENJAMIN, in his official capacity as Director of the Office of Professional Regulation, | |
| *Defendants.* | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION.......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

ARGUMENT ................................................................................................................ 10

I.  THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
    CONSTITUTIONAL AND STATUTORY CLAIMS. ................................................ 11

    A.  Act 39 Unconstitutionally Coerces Plaintiffs' Members to Speak the
        State's Message on Assisted Suicide to Their Patients. .................................. 11

    B.  Act 39 Unconstitutionally Discriminates Against Plaintiffs' Members
        Based on the Content and Viewpoint of Their Speech. ................................. 16

    C.  Act 39 Cannot Survive Strict Scrutiny............................................................ 18

    D.  Act 39 Is Preempted by Federal Law and Must Be Enjoined........................ 20

II. PLAINTIFFS' MEMBERS FACE IRREPARABLE HARM TO THEIR CONSTITUTIONAL
    AND STATUTORY RIGHTS IF ACT 39 IS NOT ENJOINED.................................... 23

III. THE BALANCE OF EQUITIES STRONGLY FAVORS PLAINTIFFS' MEMBERS. ................ 23

IV. AN INJUNCTION IS IN THE PUBLIC INTEREST................................................... 24

CONCLUSION ............................................................................................................ 24

CERTIFICATE OF SERVICE ................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Able v. United States,*
    44 F.3d 128 (2d Cir. 1995)...........................................................................................10

*American Civil Liberties Union v. Ashcroft,*
    322 F.3d 240 (3d Cir. 2003).........................................................................................24

*Baxter v. Montana,*
    2009 Mt. 449 (2009) .....................................................................................................1

*Begin v. Richmond,*
    150 Vt. 517, 555 A.2d 363 (1988) .................................................................................6

*Blick v. Office of Division of Criminal Justice,*
    2010 WL 2817256 Sup. Ct. of Conn., Jud. Dist. of Hartford (Jun. 2, 2010).......................1

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011)......................................................................................................19

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct 2751 (2014)...................................................................................................20

*Centro Tepayac v. Montgomery County,*
    722 F.3d 184 (4th Cir. 2013) .......................................................................................16

*Cenzon-DeCarlo v. Mount Sinai Hospital,*
    626 F.3d 695 (2d Cir. 2010).........................................................................................21

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.,*
    598 F.3d 30 (2d Cir. 2010)..................................................................................... 10-11

*Conant v. Walters,*
    309 F.3d 629 (9th Cir. 2002) ................................................................................12, 16

*Crosby v. National Foreign Trade Council,*
    530 U.S. 363 (2000).................................................................................................20, 22

*Elrod v. Burns,*
    427 U.S. 347 (1976).....................................................................................................23

*Evergreen Association Inc., v. City of New York,*
    740 F.3d 233 (2d Cir. 2014)....................................................................................16, 18

*Frisby v. Schultz*,
    487 U.S. 474 (1988).............................................................................19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006).............................................................................20

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,
    721 F.3d 264 (4th Cir. 2013) ...............................................................16

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*,
    515 U.S. 557 (1995).............................................................................11

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) .............................................................24

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014).........................................................................18

*Metropolitan Taxicab Board of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010).................................................................23

*Miami Herald Publishing Co., v. Tornillo*,
    418 U.S. 241 (1974).............................................................................15

*Morris v. Brandenburg*,
    376 P.3d 836 (N.M. S.Ct. 2016) ...........................................................1

*New York Progress and Protection PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013).................................................................24

*Olcott v. LaFiandra*,
    793 F. Supp. 487 (Dist. Vt. 1992).........................................................6

*Oneok, Inc. v. Learjet, Inc.*,
    135 S. Ct. 1591 (2015).........................................................................20

*Pacific Gas and Electric Co. v. Public Utilities Commission of California*,
    475 U.S. 1 (1986)...........................................................................11, 24

*Perry Education Association v. Perry Local Educators' Association*,
    460 U.S. 37 (1983).............................................................................17

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ...............................................12, 16, 17

iv

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
   505 U.S. 833 (1992)................................................................................ 12-14, 20

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)................................................................................16, 17

*Reed v. Town of Gilbert,*
   135 S. Ct. 2218 (2015)............................................................................ 16-19

*Riley v. National Federation of the Blind of North Carolina Inc.,*
   487 U.S. 781 (1988)................................................................................11, 16, 19

*Rosenberger v. Rector & Visitors of University of Virginia,*
   515 U.S. 819 (1995)................................................................................17

*Sammartano v. First Judicial District Court in and for the County of Carson City,*
   303 F.3d 959 (9th Cir. 2002) ..................................................................24

*Small v. Gifford Memorial Hospital,*
   133 Vt. 552, 349 A.2d 703 (1975) ..........................................................6

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011)................................................................................17, 18

*Stuart v. Camnitz,*
   774 F.3d 238 (4th Cir. 2014) .................................................................. 12-16, 19

*Thomas v. Collins,*
   323 U.S. 516 (1945)................................................................................ 18-19

*Thompson v. Western States Medical Center,*
   535 U.S. 357 (2002)................................................................................24

*Time Warner Cable of New York City v. Bloomberg L.P.,*
   118 F.3d 917 (2d Cir. 1997)....................................................................10

*Turner Broadcasting System, Inc. v. FCC,*
   512 U.S. 624 (1994)................................................................................18, 19

*United States v. Playboy Entertainment Group Inc.,*
   529 U.S. 803 (2000)................................................................................18

*Washington v. Glucksberg,*
   521 U.S. 702 (1997)................................................................................15

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943)......................................................................................11

*Wooley v. Maynard*,
    430 U.S. 705 (1977)......................................................................................11

**STATUTES AND REGULATIONS**

38 U.S.C. § 7332......................................................................................................19

42 U.S.C. § 1395y.....................................................................................................3

42 U.S.C. § 14402....................................................................................................21

42 U.S.C. § 18113(a).........................................................................................20-23

12 V.S.A. § 1909.......................................................................................1, 2, 4, 25

18 V.S.A. § 1852........................................................................................................9

18 V.S.A. § 1871................................................................................1, 2, 4, 7, 25

18 V.S.A. § 5281........................................................................................................3

18 V.S.A. § 5282................................................................................1, 2, 4, 7, 25

18 V.S.A. § 5283.................................................................................................3, 6-7

18 V.S.A. § 5285........................................................................................................6

18 V.S.A. § 5289......................................................................................................23

18 V.S.A. § 5290......................................................................................................23

23 V.S.A. § 1318(c)...................................................................................................9

23 V.S.A. § 1354(a)...................................................................................................9

23 V.S.A. § 1355........................................................................................................9

23 V.S.A. § 1361(b)...................................................................................................9

26 V.S.A. § 1354(b)...................................................................................................9

ORS 127.800..............................................................................................................1

ORS 127.885..............................................................................................................1

RCW 70.245.10 ...........................................................................................................1

RCW 70.245.190 .........................................................................................................1

**OTHER AUTHORITIES**

Act 27, § 1(b) (2015) ................................................................................................23

Act 172, FY 2017 Omnibus Appropriations Act (June 2016)
http://legislature.vermont.gov/assets/Documents/2016/Docs/ACTS/ACT172/ACT172%20As%2
0Enacted.pdf ..............................................................................................................21

*In re Alan Edward Bonsteel, M.D.*, Vt. Bd. of Med. Pract. No. MPN 145-0513, Stipulation and
Consent Order (Nov. 21, 2013)..................................................................................10

*In re Amalia F. Lee, M.D.*, Vt. Bd. of Med. Pract. Nos. MPC 165-1210/MPC 088-0712,
Specification of Charges, Stipulation and Consent Order (Dec. 2, 2015) ................................9, 10

*In re Benjamin Holobowicz, Jr., PA-C*, Vt. Bd. of Med. Pract. No. MPN 130-1110, Stipulation
and Consent Order (May 1, 2013) ...............................................................................9

*In re Warren R. Montgomery, PA-C*, Vt. Bd. of Med. Pract. No. MPN 129-1110, Stipulation and
Consent Order (Mar. 6, 2013)......................................................................................9

*In re Jeffrey Scott Wulfman, M.D.*, Vt. Bd. of Med. Pract. No. MPN 037-0213, Stipulation and
Consent Order (Sept. 2, 2015) ..................................................................................9, 10

Rules of the Board of Medical Practice, available at
http://healthvermont.gov/hc/med_board/documents/BoardRules2001_000.pdf ...........................9

Witness List in House of Representatives for 2015, No. 27,
http://legislature.vermont.gov/committe/document/2016/Witness................................................23

## INTRODUCTION

Vermont's Act 39 makes the State the first and only one to mandate that all licensed healthcare professionals counsel terminal patients about the availability and procedures for physician-assisted suicide, and refer them to willing prescribers to dispense the death-dealing drug. Act 39 coerces professionals to counsel patients about the "benefits" of assisted suicide – benefits that Plaintiffs' members do not believe exist – and in addition stands in opposition to a federal law protecting healthcare professionals who cannot participate in assisted suicide for conscientious reasons. Because Plaintiffs' attempts to repeal or amend the law have proven futile, and enforcement is imminent, Plaintiffs, on behalf of their members and similarly situated persons, hereby move this Honorable Court for a preliminary injunction enjoining Defendants from enforcing the provisions of Act 39 (18 V.S.A. § 5282) and its incorporated statutes (18 V.S.A. § 1871 and 12 V.S.A. § 1909) against their members for declining to counsel or refer patients diagnosed with "terminal conditions" on the availability of physician-assisted suicide.

## STATEMENT OF FACTS

Act 39, the "Patient Choice At End Of Life Act," made Vermont the fourth State (after Oregon, Washington, and California) to legalize assisted suicide, but the first and only one to mandate that all licensed health care professionals participate in the practice.[1] Decl. of Steven H.

---

[1] Oregon became the first State to enact physician-assisted suicide by passing the "Death With Dignity Act" in 1994 (although the law did not become effective until after an injunction was lifted in 1997). *See* ORS 127.800 *et seq*. That law contained a broad exemption for conscientious healthcare professionals. *See* ORS 127.885. Washington's "Death With Dignity Act," RCW 70.245.10 *et seq*., passed in 2008, similarly exempted healthcare professionals who declined to participate. *See* RCW 70.245.190. California's "End of Life Option Act," passed in 2015 and effective June 9, 2016, has similar provisions. Assembly Bill No. 15, Sec. 443.14 (2015). State appellate courts have ruled uniformly that no fundamental "right to die" exists under State law, although the practice has been de-criminalized in some places. *See Baxter v. Montana*, 2009 Mt. 449 (2009) (holding nothing in State constitutional precedent or statute indicated a public policy against the practice); *Blick v. Office of Div. of Criminal Justice,* Sup. Ct. of Conn., Jud. Dist. of Hartford, Jun. 2, 2010, 2010 WL 2817256 (unpublished) (dismissing claim for "right to die" as nonjusticiable); *Morris v Brandenburg,* 376 P.3d 836 (N.M. S.Ct. 2016) (no "fundamental liberty" in right to die exists under State constitution).

Aden ("Aden Decl.") at 2, ¶ 2; Exhibit "A", Enrolled Copy of Act 39. The State has done so by mandating through Act 39 and its incorporated statutes that all patients diagnosed with a "terminal condition" must receive counseling for all "options" for palliative care – including, now, the option to kill themselves with an overdose prescription of barbiturates.[2]

Plaintiff VAEH, a Vermont domestic nonprofit corporation, is a membership organization comprised of State-licensed physicians, nurses, pharmacists and other healthcare professionals who are conscientiously opposed to the practice of physician-assisted suicide. Decl. of Edmund Mahoney, Ph.D ("Mahoney Decl."), at 2, ¶ 3. VAEH has been in existence since 2003, and supports the expansion and improvement of end-of-life care and opposes the legalization of physician-assisted suicide in Vermont. *Id.* Plaintiff CMDA is a national incorporated nonprofit organization comprised of Christian physicians and allied healthcare professionals with over 17,800 members across the country and dozens of members in Vermont. Decl. of David Stevens, M.D. ("Stevens Dec.") at 2, ¶ 1. Among CMDA's purposes is opposition to the practice of physician-assisted suicide as contrary to Scripture, respect for the sanctity of human life, and traditional, historical and Judeo-Christian medical ethics. CMDA's members are committed to the sanctity of human life and it would violate their consciences to participate in, or refer for, physician-assisted suicide. *Id*. at 2, ¶ 3. VAEH and CMDA are suing on behalf of their Vermont members and others similarly situated. Mahoney Decl. at 2, ¶ 4; Stevens Decl. at 2, ¶ 1.

Rachel DiSanto, M.D., a member of both Plaintiff organizations, is a licensed family physician who practices in Newport, Vermont. Decl. of Rachel DiSanto, M.D. ("DiSanto Dec.") at 2, ¶¶ 1-2. Brian Kilpatrick, M.D., also a member of both organizations, is a licensed internal

---

[2] For the convenience of the Court and counsel, Plaintiffs will refer collectively to the mandate to counsel for assisted suicide imposed by Act 39 (18 V.S.A. § 5282) and its incorporated provisions, 18 V.S.A. § 1871 and 12 V.S.A. § 1909, as "Act 39."

medicine/pediatric physician who practices in West Pawlet, Vermont.  Decl. of Brian Kilpatrick, M.D. ("Kilpatrick Decl.") at 2, ¶¶ 1, 2.  Dr. DiSanto and Dr. Kilpatrick regularly see patients from all walks of life, and thus are required by Act 39 to counsel and/or or refer for assisted suicide any patient whom they or another member of the  healthcare team has diagnosed with a "terminal condition."   DiSanto Decl. at 2, ¶ 1; Kilpatrick Decl. at 2, ¶ 1.  Lynn Caulfield, R.N., a registered hospice nurse who practices throughout northern Vermont and a member of VAEH, likewise sees patients from all walks of life and thus is required by Defendants James C. Condos and Colin R. Benjamin, the Secretary of State and the Director of the Office of Professional Regulation, respectively, pursuant to Act 39 to counsel and/or or refer for assisted suicide patients diagnosed with "terminal conditions."  Decl. of Lynn Caulfield, R.N. ("Caulfield Decl.") at 2, ¶¶ 1-3.

Act 39's primary purpose is to remove the burden of civil and criminal liability or professional disciplinary action from physicians who prescribe a life-ending dose to patients suffering from a "terminal condition," defined in the statute to mean "an incurable and irreversible disease which would, within reasonable medical judgment, result in death within six months." Aden Decl., Ex. "A", 18 V.S.A. § 5283 and 5283(a)(5) (limitation of liability); 18 V.S.A. § 5281(10) (definition of "terminal condition"); *cf*. 42 U.S.C. § 1395y(a)(1)(C) (exclusions from coverage) (incorporating the definition of "terminal condition" that initiates eligibility for hospice care).[3] But Act 39 also broadly requires that every patient has the right to be informed of all

---

[3] The official Summary of Act 39 provides:
This act creates a process in statute by which a physician may receive immunity from civil and criminal liability and professional disciplinary action for prescribing to a patient with a terminal condition medication for the patient to self-administer to hasten his or her death.
                    * * * *
The act prohibits a health care facility or health care provider from imposing any penalty on a physician, nurse, pharmacist, or anyone else for actions taken in good faith reliance on the provisions of the chapter created by the act or refusals to act under the chapter.
Aden Decl. at 2, ¶ 3, Ex. "B", Summary of Act No. 39 (S.77).

"options" regarding terminal care in all cases of a diagnosed "terminal condition," regardless of the purpose of the patient's inquiry. *Id.*, 18 V.S.A. § 5282. By mandating that all patients in "terminal conditions" be counseled for all "options" for terminal care and incorporating the State's statutory standards of practice for patient informed consent, 18 V.S.A. § 1871 and 12 V.S.A. § 1909(d), Vermont has imposed a statutory obligation on every professional member of a "terminal" patient's care team to ensure that the patient has been counseled regarding the availability of physician-prescribed suicide and had his or her questions about the procedure answered – on pain of civil liability and/or regulatory consequences.

18 V.S.A. § 5282 provides:

The rights of a patient under section 1871 of this title to be informed of all available options related to terminal care and under 12 V.S.A. § 1909(d) to receive answers to any specific question about the foreseeable risks and benefits of medication without the physician's withholding any requested information exist regardless of the purpose of the inquiry or the nature of the information.

18 V.S.A. § 1871, enacted in 2009, is the "Patient's Bill of Rights for Palliative Care and Pain Management." It provides that "A patient has the right to be informed of all evidence-based options for care and treatment, including palliative care, in order to make a fully informed patient choice." 18 V.S.A § 1871(a). This includes all persons with terminal illnesses and all persons with chronic pain. 18 V.S.A. § 1871(b), (c). 12 V.S.A. § 1909, the informed consent statute, section (d), provides, "A patient shall be entitled to a reasonable answer to any specific question about foreseeable risks and benefits, and a medical practitioner shall not withhold any requested information." Practitioners who comply with Sec. 1909 are shielded from civil liability for lack of informed consent. 12 V.S.A. § 1909(a)(1), (2). Thus, working together, Act 39 and its incorporated provisions impose an obligation on all licensed healthcare professionals to ensure that patients who have been diagnosed with a "terminal condition" are informed about the

4

availability of physician-assisted suicide, including its "risks and benefits," and have their questions answered about the practice.

Plaintiffs' apprehension of legal consequences for its members who decline to participate in assisted suicide is certainly reasonable, based upon the plain language of Act 39 and its incorporated statutes as discussed above, but also based upon interpretive statements by State officials and persons speaking on their behalf.  Defendants, through the Vermont Department of Health, disseminate the following Frequently Asked Questions ("FAQ") information regarding Act 39 on its web site:

> Do doctors have to tell patients about this option?

> Under Act 39 and the Patient's Bill of Rights, a patient has the right to be informed of all options for care and treatment in order to make a fully-informed choice. If a doctor is unwilling to inform a patient, he or she must make a referral or otherwise arrange for the patient to receive all relevant information.

*See* Vt. Dep't of Health, "Patient Choice and Control at End of Life" (Frequently Asked Questions),  http://healthvermont.gov/family/end_of_life_care/patient_choice.aspx  (last viewed Sep. 01, 2016); Aden Decl. at 2, ¶ 4, Ex. "C".  But the Act makes no provision for such a referral or other "arrangement," and the Health Department does not state that a referral will avoid liability. Cindy Bruzzese, Executive Director of the Vermont Ethics Network (VEN), which Defendants imbue with authority to speak to the standard of care in Vermont by (among other things) linking to VEN's positions on the Department's web site (*see* DOH Web Site *supra*, "Resources and Information"), has stated publicly that physicians have a duty to inform patients of the availability of assisted suicide.  Aden Decl., at 2, ¶ 5, Ex. "E", Excerpt of *Vermont's New Normal: End-of-Life Care & Physician Aid in Dying*, Power Point Presentation October 29, 2013; see also Aden Decl. at 2, ¶ 5, Ex. "D" VEN web site statement on "Physician Assisted Death," at http://www.vtethicsnetwork.org/pad.html (last visited August 29, 2016).  Ms. Bruzzese stated in

5

the media, "Because Vermont's Patient Bill of Rights requires doctors to tell patients about all legal options available, physicians will have to tell terminally ill patients that this law is available even if the doctor chooses not to participate in writing prescriptions," and that "Doctors will have to find tactful ways to do that."  Aden Decl. at 2, ¶ 6, Ex. "F", Terri Hallenbeck, "Vermont Adjusts to New Way of Dying," USA Today, Jul. 14, 2013, http://www.usatoday.com/story/news/nation/2013/07/14/vermont-adjusts-to-new-way-of-dying/ 2514847/ (last visited Sep. 8, 2016).

Although Section 5285 of Act 39 ostensibly provides a limitation on liability, stating that physicians, nurses, pharmacists, or other persons shall not be under any duty "to participate in the provision of a lethal dose of medication to a patient," that limitation is narrow and only applies to the actual provision of the lethal prescription of medication.  18 V.S.A. § 5285(a).  Act 39 does not limit liability for civil damages resulting from negligent or intentional misconduct, which could encompass a conscientious failure or refusal to adhere to the counseling and referral mandate imposed by Act 39.  18 V.S.A. § 5285(c).[4]

Further, Act 39 strongly implies that participation in assisted suicide is mandatory for health care professionals besides the attending physician, including Plaintiffs' members.  The statute requires the referral of the patient to a second physician "for medical confirmation of the

---

[4] In fact, Act 39 arguably *enlarges* the scope of civil liability for licensed healthcare professionals in Vermont.  Tort liability for lack of informed consent is ordinarily limited to consent obtained for particular medical procedures.  *See, e.g., Small v. Gifford Mem. Hosp*., 133 Vt. 552, 349 A.2d 703 (1975) (physician's duty is to give patient all information material to decision to undergo proposed treatment); *Begin v. Richmond*, 150 Vt. 517, 523, 555 A.2d 363, 367 (1988) ("a prerequisite to liability [under § 1909] is that a reasonable patient would not have given consent to the medical procedure if he had fully known of the risks").  There is no liability for failure to obtain informed consent when one has properly referred the procedure to another.  *Olcott v. LaFiandra*, 793 F. Supp. 487 (Dist. Vt. 1992) (physician who referred patient to specialist for surgical procedure was not required to obtain informed consent, since he did not perform the procedure).  By imposing a statutory duty to ensure that "all patients" receive counseling on "all options" related to palliative care, including physician-assisted suicide, regardless of who may ultimately provide the procedure, the State may have imposed a new liability on conscientious Vermont healthcare professionals they did not have before.

diagnosis, prognosis, and a determination that the patient was capable, was acting voluntarily, and had made an informed decision." 18 V.S.A. § 5283(7). Section 1871, the "Patient's Bill of Rights," applies to a "pediatric patient with a serious or life-limiting illness or condition...," 18 V.S.A. § 1871(e), necessarily involving the participation of a licensed pediatrician. Act 39 also allows the participating physician to refer the patient for an evaluation by a psychiatrist, psychologist, or clinical social worker licensed in Vermont for confirmation that the patient was capable and did not have impaired judgment, 18 V.S.A. § 5283(8), and requires the participating physician to attest that "[i]f applicable, the physician consulted with the patient's primary care physician with the patient's consent." 18 V.S.A. § 5283(9). Nothing in the Act or its incorporated statutes limits liability for regulatory action or civil or criminal action for a conscientious failure or refusal to participate on the part of referral physicians or other professionals who decline to accept such a referral, including pediatricians, psychiatrists, psychologists, or clinical social workers.[5]

Act 39 purports to simply wave away any legal, moral or ethical culpability for participating in the act of assisted suicide by providing:

> A physician who engages in discussions with a patient related to such risks and benefits in the circumstances described in this chapter shall not be construed to be assisting in or contributing to a patient's independent decision to self-administer a lethal dose of medication, and such discussions shall not be used to establish civil or criminal liability or professional disciplinary action.

18 V.S.A. § 5282.

However, this provision does not absolve physicians and healthcare professionals of the legal consequences for *failing or refusing* to discuss assisted suicide as their own consciences direct (*i.e.*, failing or refusing to follow Act 39). Nor can it absolve them of moral or ethical

---

[5] Notably, nothing in Act 39 limits civil or criminal liability for "misconduct" that is intentional, such as willful refusals to participate. 18 V.S.A. § 5283(b).

culpability for doing so.  Mahoney Decl. at 3-4, ¶¶ 10-11; Stevens Decl. at 4, ¶ 9.   Thus, beyond a nominal protection for "participation" in the actual provision of the lethal dose, Act 39 provides open-ended liability for conscientious objectors in all other aspects of assisted suicide, and offers no respect for the position that physician-assisted suicide is not medically appropriate.

Defendants filed a Motion to Dismiss Plaintiffs' lawsuit on September 25, 2016, which in essence "doubles down" on the mandatory counseling and referral imposed by Act 39:

> In defendants' view, physicians do have a professional obligation to ensure that patients who inquiry about aid-in-dying or the Act 39 process receive accurate information.  Physicians may provide that information directly or, if they object to doing so, may take other steps to ensure that the patient receives information, through a referral to another provider, to an organization [such as pro-assisted-suicide group Compassion and Choices, which the Department links to on its web site], or to written or online materials about the Act that are readily available to the patient.

Defs' Mem. of Law in Supp. of Mot. to Dismiss at 11.  Defendants likewise state, "To the extent the Act imposes any obligation at all, it is, at most, to either provide accurate information to patients who ask or direct those patients to other sources of information about the Act 39k process." *Id*. at 6.  *See also id.* at 9 ("[Act 39] says that doctors unwilling to provide information about Act 39 either refer a patient or arrange for the patient to receive information.").  They add, "[b]ut that limited obligation is not what plaintiffs challenge here; they challenge a non-existent requirement that physicians and other providers 'participate in assisted suicide.'" *Id*. at 11. But this coerced speech is *precisely* what plaintiffs are challenging. Because being forced by the State to counsel and refer for a procedure they do not believe provides any medical benefit and which they ethically oppose is the essence of coerced speech in violation of the First Amendment, Plaintiffs have had to bring this lawsuit.

The Defendants may move against Plaintiffs' members for refusing to comply with Act 39 at any time.  Defendant chair and members of the Board of Medical Practice set standards for

issuing licenses, investigate complaints of unprofessional conduct, and discipline and regulate the practices of license holders. Rules of the Bd. of Med. Practice, Rule 1.1, available at http://healthvermont.gov/hc/med_board/documents/BoardRules2001_000.pdf (last viewed Sep. 20, 2016). "[U]nprofessional conduct" includes a failure to comply with the provisions of the Patient's Bill of Rights (18 V.S.A. § 1852) and "failure to comply with provisions of federal or state statutes [e.g., Act 39] governing the practice of medicine or surgery." 23 V.S.A. § 1354(a), 1354(a)(24), (27); *cf.* Rules of the Bd., Rule 4.1 (listing statutory grounds for disciplinary action). Upon a negative decision, the Board may reprimand Plaintiffs' members or condition, limit, suspend or revoke their licenses. 23 V.S.A. § 1361(b).

The Board's enforcement is driven by members of the public, some of whom have an interest in enforcement of Act 39. 23 V.S.A. § 1355(a) (any person or entity may submit a complaint to the Board). The Board has opened regulatory complaints upon learning of a patient's negative outcome from public media sources,[6] and upon referral from an attorney (who was also a patient),[7] a patient,[8] and a physician's employer.[9] Complaints are a matter of public record. 23 V.S.A. § 1318(c)(1).

The Board can find that "[f]ailure to practice competently by reason of any cause on a single occasion" constitutes unprofessional conduct. 26 V.S.A. § 1354(b). Failure to practice competently includes "performance of … unacceptable patient care" or "failure to conform to the essential standards of acceptable and prevailing practice." 26 V.S.A. § 1354(b)(1). A case has

---

[6] S*ee, e.g., In re Benjamin Holobowicz, Jr.*, PA-C, Vt. Bd. of Med. Pract. No. MPN 130-1110, Stipulation and Consent Order ¶ 3, May 1, 2013; *In re Warren R. Montgomery, PA-C*, Vt. Bd. of Med. Pract. No. MPN 129-1110, Stipulation and Consent Order ¶ 3, Mar. 6, 2013.
[7] *In re Amalia F. Lee, M.D.*, Vt. Bd. of Med. Pract. Nos. MPC 165-1210/MPC 088-0712, Specification of Charges ¶ 3.
[8] *In re Amalia F. Lee, M.D., supr*a, n7, Stipulation and Consent Order ¶ 3, Dec. 2, 2015.
[9] *See, e.g., In re Jeffrey Scott Wulfman, M.D.*, Vt. Bd. of Med. Pract. No. MPN 037-0213, Stipulation and Consent Order ¶ 3, Sep. 2, 2015.

resulted from a report of a physician's care of a patient evaluated with a suicide gesture (*i.e.*, actions imitating suicide as a "cry for help").[10] If a physician fails to refer a patient to another physician qualified to attend to the patient's therapeutic needs, it may be the basis for a finding of gross negligence.[11] A failure to communicate adequately with a primary doctor (such as, e.g., on a referral for an evaluation for assisted suicide) may also be grounds for a finding of unacceptable medical care.[12]

Because they cannot counsel or refer for physician-assisted suicide in their practices, and Act 39 imposes upon them a present obligation to do so that gives rise to potential liability for action against them for failing to deliver "acceptable patient care," Plaintiffs' members reasonably fear that civil, criminal and regulatory action against them is imminent.  Mahoney Decl. at 3, ¶ 7; Stevens Decl. at 7, ¶ 18. Consequently, because Act 39 and its associated statutes infringe upon the constitutional and statutory rights of Plaintiffs' members, Plaintiffs filed their Complaint herein on July 18, 2016 (Docket No. 01), and now move for preliminary relief on Counts I, V, IX and X.

## ARGUMENT

**Preliminary Injunction Standard.**

A plaintiff seeking a temporary injunction must demonstrate 1) irreparable harm, and 2) either a) a likelihood of success on the merits or b) "sufficiently serious questions going to the merits" and hardship, on balance, to the plaintiff.  *Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995). The Court must also consider the public interest.  *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 929 (2d Cir. 1997).  "The 'serious questions' standard permits a

---

[10] *In re Amalia Lee, M.D., supra*, n7, Stipulation and Consent Order ¶ 4.
[11] *In re Alan Edward Bonsteel, M.D.*, Vt. Bd. of Med. Pract. No. MPN 145-0513, Stipulation and Consent Order ¶ 5, Nov. 21, 2013.
[12] *In re Wulfman, M.D., supra*, n9, Stipulation and Consent Order ¶¶ 9-12.

district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Plaintiffs prevail under either standard.

I.   **THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL AND STATUTORY CLAIMS.**

A.   **Act 39 Unconstitutionally Coerces Plaintiffs' Members to Speak the State's Message on Assisted Suicide to Their Patients.**

The First Amendment protects Plaintiffs' members from being compelled to engage in government-compelled speech.  The "right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). Accordingly, the First Amendment protects not only the right of a speaker to choose what to say, but also the right of the speaker to decide "what not to say." *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (quoting *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986)) (internal quotation marks omitted).[13] Plaintiffs' members believe that physicians must not abandon their time-honored role as healers, and that physician-assisted suicide is neither medically indicated for any patient in a "terminal condition" nor ethically defensible in any situation.  Consequently, they prefer to refrain from speaking about it at all with patients, or, if they do, to speak against it in the strongest terms that are not consistent with the process of informed consent, and certainly do not reflect an objective assessment of the

---

[13] With respect to physician-assisted suicide, as with other sensitive and controversial topics, the First Amendment "presume[s] that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed. of the Blind of N.C. Inc.*, 487 U.S. 781, 791 (1988).

"risks and benefits" of assisted suicide, as the Act requires.  *See* Mahoney Decl. at 4-5, ¶¶ 15-18; Stevens Decl. at 3-4, ¶¶ 6-7; DiSanto Decl. at 4-5, ¶¶ 12-18; Kilpatrick Decl. at 4-5, ¶¶ 13-18; Caulfield Decl. at 2-4, ¶¶ 11-20.[14]

The purpose and legislative history of Act 39, and Defendants' interpretation thereof, make it clear that the Act was intended to require Plaintiffs' members to promote the State's view that physician-assisted suicide may be medically indicated for "terminal conditions," and force them to counsel patients for physician-assisted suicide in violation of the right of conscience.  Aden Decl., Ex. "B", Act 39 Summary Statement. But healthcare professionals enjoy First Amendment rights within their practice. *Stuart v. Camnitz*, 774 F.3d 238, at 247 (4th Cir. 2014) ("the physician's First Amendment rights not to speak *are* implicated"), quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (plurality op.) (emphasis in *Stuart*); *Pickup v. Brown*, 740 F.3d 1208, 1227 (9th Cir. 2014) ("[D]octor-patient communications about medical treatment receive substantial First Amendment protection.") (emphasis omitted).   Even a doctor who publicly advocates a treatment the medical establishment considers outside the mainstream is entitled to robust protection under the First Amendment.  *See, e.g., Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (affirming injunction prohibiting government from threatening revocation of a physician's license for recommending medical use of marijuana). So much more here, where Plaintiffs' members views are *mainstream*–witness the American Medical Association's statements on physician-assisted suicide. Stevens Decl. at 3, ¶ 6; *id*. at 7, ¶ 17.

---

[14] There can be no doubt that Vermont "coerces" Plaintiffs' members to engage in speech with which they disagree.  As the court of appeals observed in *Stuart v. Camnitz*, 774 F.3d 238, at 247 (4th Cir. 2014), the government regulates by threatening consequences for violation of the norm. Vermont, through Defendants, threatens Plaintiffs' members with professional, civil and criminal consequences for holding opposing views.  In fact, it is likely that if CMDA's members are forced to inform patients of their right to physician-assisted suicide in violation of their consciences, they would leave the profession or relocate from the State of Vermont.  Stevens Decl. at 2, ¶ 4.

Although a State may regulate the conduct of informed consent by requiring providers to relay *factual* information to patients, the First Amendment protects doctors and others from having to make "ideological" statements to patients.  *Stuart*, 774 F.3d at 246.  Act 39 fails the *Casey* standard because, like the mandated disclosures held unconstitutional by the Fourth Circuit in *Stuart*, the counseling mandated by Act 39 is "ideological in intent and in kind."  774 F.3d at 242, 243.  The statements Act 39 requires are "ideological" because they force Plaintiffs' members to state personal views regarding physician-assisted suicide they refuse to make.  They require physicians and others to counsel and/or refer for assisted suicide as "palliative care" in all cases in which a "terminal" diagnosis has been made, discussing the "risks and benefits" of self-destruction.  In so doing, the State is overriding practitioners' judgment by making two essential determinations on their behalf. It is first imposing the medical decision that assisted suicide may be indicated for any diagnosis of "terminal" condition, and second the ethical judgment that assisted suicide is morally appropriate for any diagnosis of a "terminal" condition. Plaintiffs' members strenuously disagree with both statements as a matter of medical practice and as a matter of medical ethics, and desire to remain silent on the subject or engage in speech that does not partake of the notion of "informed consent."  *See* Mahoney Decl. at 5, ¶¶ 18-19; Stevens Decl. at 3-4, ¶¶ 5-8; DiSanto Decl. at 4-5, ¶¶ 12-18; Kilpatrick Decl. at 4-5, ¶¶ 13-19; Caulfield Decl. at 2-3, ¶¶ 11-12. [15]  Moreover, the statements are not required of doctors providing informed consent to patients for procedures the doctors will perform, as in *Casey*, but for all healthcare professionals

[15] There are many intractable therapeutic problems with assisted suicide, not the least of which is the risk to one who survives.  One prominent physician in Vermont, the chief medical officer of a hospital system, stated after Act 39 was signed that there was no consensus on what medication should be used to end a patient's life.  *See* Terri Hallenbeck, "Vermont Adjusts to New Way of Dying," USA Today, Jul. 14, 2013, http://www.usatoday.com/story/news/nation/2013/07/14/vermont-adjusts-to-new-way-of-dying/ 2514847/ (last visited Sep. 8, 2016) (Aden Decl. Ex. F.). *See also* Stevens Dec. at 5-7, ¶¶ 10-17 (medical literature regarding patient harms).

who provide care to patients in "terminal" situations, whether the professional believes assisted suicide is medically beneficial and regardless of the patient's or the professional's personal or medical beliefs against it.

Thus, like the requirements of the North Carolina statute in *Stuart*, Act 39 bears no resemblance to traditional informed consent or the variation found in *Casey*. *Stuart*, 774 F.3d at 242 ("The means used by [Vermont] extend well beyond those states have customarily employed…."); *id*. at 252 (*Casey* provisions "deviate[d] only modestly from traditional informed consent"). *Casey* upheld requirements that abortion doctors deliver certain messages to patients in the course of treatment--specifically, in order to obtain informed consent to perform abortions on them. But *Casey* deemed the disclosure justified as part of obtaining informed consent prior to a surgical procedure: "as with any medical procedure, the State may require a woman to give her written informed consent." 505 U.S.at 881. The Act's compelled disclosures are not part of informed consent before performing a procedure; in fact, Act 39 mandates counseling by healthcare professionals who will *not* perform the procedure because they ethically oppose it and who are in fact protected by State law for their refusal to perform it, and like the law in *Stuart*, it mandates counseling with patients who have no interest in it and do not want to hear about it. And like the law struck down in *Stuart*, there is no provision for a patient to opt out of hearing about assisted suicide, even if it is highly offensive to them. 774 F.3d at 242, 243.

Act 39 is on all fours with the law declared unconstitutional in *Stuart*. Vermont's law employs disproportionate means to further the alleged governmental interest in patient information, it threatens harm to patients' psychological health, it interferes with professional judgment and it compromises the doctor-patient relationship. *Id*. at 250. Vermont is alone among the States in its determination to force conscientious healthcare professionals to participate in

14

ensuring that patients know that they have the option to kill themselves; Act 39 imposes "a virtually unprecedented burden on the right of professional speech that operates to the detriment of both speaker and listener." *Id*. at 252.  In so doing, it threatens harm to a patient's psychological health, both by appearing to approve assisted suicide and by the harm that the discussion itself would have for vulnerable patients.  Stevens Decl. at 4-10, ¶¶ 7-16; DiSanto Decl. at 5-6, ¶¶ 19-20. As in *Stuart*, potential psychological harm to patients cuts against the disclosures, 774 F.3d at 250-51, and as the U.S. Supreme Court has noted in the context of holding against a "right" to assisted suicide, the interest in the "integrity and ethics of the medical profession" also cuts against the State. 774 F.3d at 251, citing *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997).

That a healthcare professional may express his or her own views to the patient is notwithstanding for First Amendment purposes. *Stuart*, 774 F.3d at 246.   "One who chooses to speak may also decide what not to say." *Id*. at 245.  In the first place, as the *Stuart* court noted, listeners may think the message is the healthcare professional's speech, and thereby impute the State's message to the healthcare provider. *Id*. at 246.  Moreover, Plaintiffs' members are well aware that patients put their trust in physicians and healthcare professionals, and tend to regard their statements with a heightened degree of credulity.  Stevens Decl. at 4, ¶ 10.  They are also aware of literature in the medical field that shows that patients who encounter healthcare workers who affirm the availability of assisted suicide are likely to believe their feelings of hopelessness are reinforced and to seek the procedure as a result.  Stevens Decl. at 5, ¶ 11.  "The court can and should take into account the effect of the regulation on the intended recipient of the compelled speech, especially where she is a captive listener." *Stuart*, 774 F.3d at 245; *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256–57 (1974) (forcefully rejecting attempt to "[c]ompel[] editors or publishers to publish that which 'reason tells them should not be published'"). Likewise, in

15

*Riley,* the Supreme Court recognized that forcing a speaker to begin his relationship with an unwanted disclosure, as the state tried to do with charitable solicitors in that case, imposes a severe harm to free speech rights because a negative message may end the communicative relationship before it begins. *Riley v. Nat'l Fed. of the Blind of N.C. Inc*., 487 U.S. 781, 799-800 (1988).

Because Act 39 coerces Plaintiffs' members to speak the State's message on the availability and "benefits" of assisted suicide to their patients, even though they believe it to be medically contraindicated and morally wrong, Act 39 is an unconstitutional imposition that must be enjoined.

**B.      Act 39 Unconstitutionally Discriminates Against Plaintiffs'
Members Based on the Content and Viewpoint of Their Speech.**

"A regulation compelling speech is by its very nature content-based…." *Stuart*, 774 F.3d at 246; *Centro Tepayac v. Montgomery Cty*., 722 F.3d 184, 189 (4th Cir. 2013) (*en banc*); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of  Baltimore*, 721 F.3d 264, 286 (4th Cir. 2013) (*en banc*).  "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795; *cf. Evergreen Ass'n  v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014) ("'We therefore consider [laws mandating speech]' to be 'content-based regulations'" (quoting *Riley*, *supra*)).  Content-based speech regulations are, in turn, presumptively unconstitutional.  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Conant*, 309 F.3d at 637–38 (deeming content-based restrictions on professional speech presumptively invalid).  Act 39 is content-based because it covers only speech between professionals and patients related to end-of-life care.  *Cf. Pickup*, 740 F.3d at 1226-27 (policy against "recommending" medical marijuana in *Conant* was content-based because it covered only doctor-patient speech that included discussions of the medical use of marijuana).

Act 39 is also directed against the viewpoint of conscientious healthcare professionals regarding assisted suicide. *Pickup*, 740 F.3d at 1227 (policy against discussing medical marijuana was also viewpoint-based because it condemned expression of a particular viewpoint, "i.e., that medical marijuana would likely help a specific patient").  Healthcare professionals who counsel patients about all aspects of "palliative care" including physician-assisted suicide are under no risk from the State because the State has removed civil, criminal and regulatory liability for such conversations, whereas those who by reasons of conscience counsel on all aspects of "palliative care" *except* one - physician-assisted suicide - risk losing their livelihoods.  "Viewpoint discrimination is [] an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination is a "blatant" First Amendment violation. *Id.*; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (holding that the government cannot "suppress expression merely because public officials oppose the speaker's view").

The harm imposed on Plaintiffs' members by Act 39 makes it indistinguishable from the Vermont statute the U.S. Supreme Court declared unconstitutional in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).  The *Sorrell* statute regulated speech related to pharmaceuticals because of disagreement with particular kinds of speakers and their speech. "[T]he Vermont Legislature explained that detailers, in particular those who promote brand-name drugs, convey messages that 'are often in conflict with the goals of the state.'" 564 U.S. at 565 (citation omitted). This "goes even beyond mere content discrimination, to actual viewpoint discrimination." *Id.* (quoting *R.A.V.*, 505 U.S. at 391). Because the Legislature enacted Act 39 for the express purpose of co-opting

Plaintiffs' members into speaking the State's message on the availability and "benefits" of physician-assisted suicide, it is an unconstitutional imposition on their First Amendment rights that must be enjoined.

### C.     Act 39 Cannot Survive Strict Scrutiny.

"In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 564 U.S. at 571; *cf. United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817-18 (2000) (viewpoint and content-based speech restrictions are presumed unconstitutional). However, should the Court desire to assess the government's interest in imposing assisted suicide counseling mandates on Plaintiffs' members, it should be readily apparent that Act 39 is not narrowly tailored, since it does not further a compelling governmental interest by the least restrictive means available. *Playboy Entm't Grp., Inc.*, 529 U.S. at 813 (strict scrutiny review under the First Amendment requires that the Act "be narrowly tailored to promote a compelling government interest").

"A law that is content-based on its face is subject to strict scrutiny." *Reed*, 135 S. Ct. at 2228; *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014) (laws that are content or viewpoint-based "must satisfy strict scrutiny").[16] "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. FCC ("Turner I")*, 512 U.S. 624, 642 (1994); *Thomas v. Collins*, 323 U.S. 516,

---

[16] Although the Fourth Circuit held in *Stuart* that the standard of review was intermediate scrutiny, that holding does not apply in this case because the North Carolina law was an example of mixed speech and conduct. 774 F.3d at 245. Here, the State requires pure ideological speech of Plaintiffs' members, including a discussion of "benefits" that Plaintiffs' members do not believe exist, and consequently the standard must be strict. Nonetheless, because Defendants cannot show government's interest is important, and because of the plethora of other means available, Act 39 fails intermediate scrutiny as well. *See Evergreen Association, supra,* 740 F.3d at 250 (forced disclosure would pass muster under neither standard, given ideological nature and availability of alternatives).

530 (1945) ("Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation" of the fundamental right to free speech.)[17] "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal citations omitted). The State "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner I*, 512 U.S. at 664.  "The State must specifically identify an 'actual problem' in need of solving . . . and the curtailment of free speech must be actually necessary to the solution. . . .  That is a demanding standard." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citations omitted); *cf. Stuart*, 774 F.3d at 251 (the State statute "must directly advance" its interests).

Ensuring that Vermont patients are aware of "all options" for end-of-life care available from other providers is far from a compelling government interest.  In *Riley*, the government asserted an interest in ensuring that potential donors were made aware of certain financial information concerning professional fundraisers.  Rejecting the State's attempt to require even professional fundraisers to provide this information to donors, the Court explained that the government can spread this message itself: "[f]or example, as a general rule, the State may itself publish the detailed [information it wants the public to know]. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Riley*, 487 U.S. at 800.  Likewise, the remaining regulations of Act 39 adequately advance the state's interest. *Cf. Stuart*, 774 F.3d at 243-44 (listing extensive existing informed consent requirements that already existed and were not challenged).  Physicians are

---

[17] As Justice Breyer implied in *Reed v. City of Gilbert*, one example of such a compelling governmental interest may be the federal statute that permits a physician to disclose to a patient's spouse or sexual partner that the patient has HIV.  135 S. Ct. at 2235 (Breyer, J., concurring in the judgment), citing 38 U.S.C. § 7332.

already subject to informed consent requirements, and to potential civil, criminal and regulatory liability in appropriate circumstances for failing to live up to the standard of care relating to them.

In a narrow tailoring analysis, government's interest must be specifically defined. *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751 (2014). The government's interest in forcing healthcare providers to counsel patients for therapies and prescriptions that others will administer is very attenuated from both the traditional concept of informed consent and the variation approved in *Casey*. There is no real equivalent here. Act 39 mandates an unequal regime of care; pro-assisted suicide healthcare professionals counsel on all options they themselves regard as medically advisable and ethical, while pro-life professionals are forced to counsel on an option they regard as ill-advised and unethical, on pain of civil and criminal liability or regulatory enforcement, including losing their license. This mandate is the essence of content and viewpoint discrimination, and must be enjoined.

### D.     Act 39 Is Preempted by Federal Law and Must Be Enjoined.

The nondiscrimination provision of the Affordable Care Act ("ACA"), 42 U.S.C. § 18113(a), conflicts with and overrides the Act 39's mandatory counsel and refer provisions, and therefore the operation of Act 39 and its related statutes must be enjoined. Complaint Counts V (ACA); Count IX (State Declaratory Judgment Act); and Count XI (State APA Claim). When federal and state law conflict, federal law preempts the conflicting state law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see also Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015) (affirming the conflict preemption principle). Act 39 conflicts with the ACA by "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373. The ACA states that "any State or local

government or health care provider that receives Federal financial assistance under [the Affordable Care Act] . . . may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a) (2012).[18] Because the State of Vermont receives federal financial assistance under the ACA,[19] Defendants are bound by this provision. The objective of the ACA provision is to protect from discrimination health care entities and individuals such as Plaintiffs' members who object to providing or assisting with services such as physician-assisted suicide.  This is clear from the text of the statute, as its terms directly provide Plaintiffs' members with protection from discrimination on the basis of their conscientious objection.  *Cf. Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 698 (2d Cir. 2010) (recognizing "evidence of intent to confer or recognize an individual right" on conscientious healthcare professionals via the federal Church Amendment).

---

[18] The legislative history of the ACA provision also suggests that one of the objectives of Congress was to protect health care entities and individuals who object to physician-assisted suicide.  The Senate Committee on Finance's report accompanying S. 1796 in the 111th Congress—a bill which was merged with S. 1679 of the Senate Committee on Health, Education, Labor, and Pensions and later became H.R. 3590 (ACA)—contained a section that discussed existing federal law, the Assisted Suicide Funding Restriction Act of 1997 § 3, 42 U.S.C. § 14402 ("ASFRA") that prohibits physician-assisted suicide in federal programs and facilities. In language closely tracked by the ACA provision, ASFRA prohibits federal funds from being used to "provide any health care item or service furnished for the purpose of causing, or assisting in causing, the death of any individual, such as by assisted suicide." S. Rep. No. 111-89, at 135 (2009) (discussing § 14402).  S. 1796 included a new provision that would have added to ASFRA by prohibiting any government or health care provider from discriminating against a health care entity or individual on the basis of that entity's or individual's refusal to participate or assist in physician-assisted suicide.  *Id.* at 135-36.  The anti-discrimination provision was incorporated into the final version of the ACA, *see* 42 U.S.C. § 18113(a), advancing Congress's objective of protecting health care entities and individuals who object to physician-assisted suicide.  The inclusion of language reflecting existing federal law prohibiting discrimination against healthcare professionals opposed to physician-assisted suicide strongly suggests that Congress intended that the anti-discrimination provision directly protect health care entities and individuals from suffering discrimination because they decline to participate in the practice.

[19] *E.g.*, Act 172, FY 2017 Omnibus Appropriations Act June 2016, http://legislature.vermont.gov/assets/Documents/2016/Docs/ACTS/ACT172/ACT172%20As%20Enacted .pdf at 108, 163, 172 (referring to appropriation sources from PPACA).

*Crosby* demonstrates the direct conflict between federal and state law in this case. *Crosby* involved a federal law through which Congress intended to give the President authority to control sanctions against Burma. 530 U.S. at 368-69. To effectively do this, Congress specifically tailored the law to allow certain types of sanctions and gave the President full authority to control the sanctions implemented. *Id.* at 374-80. Shortly before Congress passed the federal law, Massachusetts also passed a law implementing sanctions against Burma. *Id.* 366-67. The Supreme Court explained that the Massachusetts law was an obstacle to Congress's purposes behind the federal law because, by imposing its own sanctions, some of which were different from those authorized by federal law, the Massachusetts law restricted the President's ability to fully control the sanctions implemented against Burma. *Id.* at 374-80. Because the Massachusetts law conflicted with federal law, the federal law was preemptive. *Id.* at 373-74, 388.

As in *Crosby*, Act 39 imposes an intractable conflict between federal and state law. The ACA purports to safeguard Plaintiffs' members in the exercise of their conscientious objections to assisted suicide, while Act 39 threatens civil, criminal and regulatory liability for the same speech and conduct. Act 39 thus acts as an obstacle to Congress's objective in passing § 18113(a) in the most direct way possible—it mandates violations of § 18113(a). By interpreting Act 39 as requiring licensed healthcare professionals to provide patients with information on physician-assisted suicide and subjecting those physicians to potential civil, criminal, and professional discipline and deprivation of their livelihood on the basis of their refusal to participate in physician-assisted suicide, Act 39 is the State of Vermont's authorization of the very kind of discrimination against Plaintiffs' members from which § 18113(a) protects them. Therefore, Act 39 as interpreted by Defendants stands as an obstacle to the purpose and objective of § 18113(a), conflicting with the federal law. Act 39 is therefore preempted by § 18113(a) and must be enjoined.

The Second Circuit has held that preemption satisfies the "likelihood of success on the merits" prong of the preliminary injunction inquiry. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 155, 158 (2d Cir. 2010) (holding that Plaintiff had demonstrated a likelihood of success on the merits in challenge to certain taxicab rules because Plaintiff had shown that federal law preempted the rules). Because 42 U.S.C § 18113(a) preempts Act 39, Plaintiffs can demonstrate likelihood of success on the merits with their claim, and the court should grant the requested preliminary injunction.

## II.   PLAINTIFFS' MEMBERS FACE IRREPARABLE HARM TO THEIR CONSTITUTIONAL AND STATUTORY RIGHTS IF ACT 39 IS NOT ENJOINED.

It is settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Act 39 originally included a sunset mechanism on the operative provisions that was set for July 1, 2016, but the sunset provisions were repealed in the last session. 18 V.S.A. §§ 5289, 5290 repealed by 2015, No. 27, § 1(b), eff. May 20, 2015. VAEH, as well as individual members of VAEH and CMDA, made vigorous efforts to repeal or amend the statute in the current session, but failed. *See* Witness List in House of Representatives for 2015, No. 27, at http://legislature.vermont.gov/committee/document/2016/16/Witness (last viewed Sep. 22, 2016). Because Defendants have authority to take legal actions against Plaintiffs' members for a single instance of "unprofessional conduct," including the refusal to counsel and refer for assisted suicide in violation of state law, Plaintiffs' members currently face imminent risk in their practices from the operation of Act 39, and will suffer irreparable harm if the Act is not enjoined.

## III.   THE BALANCE OF EQUITIES STRONGLY FAVORS PLAINTIFFS' MEMBERS.

Enjoining Act 39 will restore Plaintiffs' members to the *status quo ante*, practicing without restriction on their First Amendment right to free speech and enjoying the protections of the ACA

that Congress intended for conscientious physicians opposed to assisted suicide. The State would suffer no harm at all, since it would retain its professed interest in ensuring that patients know of their rights under Act 39 by means that are less restrictive of individual rights.  Thus, the balance of equities strongly favors Plaintiffs' members, and Act 39 should be enjoined.

IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST.

A  preliminary  injunction  will  serve  the  public  interest  by  protecting  the  First  and Fourteenth Amendment rights and federal statutory protections of Plaintiffs' members.  *N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest.").  There is a "'significant public interest' in upholding free speech principles, as the 'ongoing enforcement of the potentially unconstitutional regulations . . . would infringe not only the free expression interests of [plaintiffs], but also the interests of other people' subjected to the same restrictions."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Sammartano v. First Jud. Dist. Ct.,* 303 F.3d 959, 974 (9th Cir. 2002)).  The public can have no interest in enforcement of government mandates compelling citizens to speak its favored message.  "[F]ree speech 'serves significant societal interests'. . . . By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pac. Gas & Elec. Co.* 475 U.S. at 8. There is no public "interest in the enforcement of an unconstitutional law."  *ACLU v. Ashcroft*, 322 F.3d 240, 251 n. 11 (3d Cir. 2003).

## CONCLUSION

"If the First Amendment means anything, it means that regulating speech must be a last-not first-resort. Yet here it seems to have been the first strategy the Government thought to try." *Thompson. v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).  For the reasons set forth above,

24

Plaintiffs ask this Court enter a preliminary injunction prohibiting Defendants from enforcing against Plaintiffs' members and similarly situated conscientious objectors to providing assisted suicide the provisions of 18 V.S.A. § 5282 of Act 39 and its incorporated statutes (18 V.S.A. § 1871 and 12 V.S.A. § 1909) for their refusal to counsel patients diagnosed with "terminal conditions" about physician-assisted suicide.

Respectfully submitted,

VERMONT ALLIANCE FOR ETHICAL HEALTHCARE
CHRISTIAN MEDICAL & DENTAL ASSOCIATION

By their attorneys:

____/s/ Steven H. Aden_____
Steven H. Aden *Pro hac vice*
Matthew S. Bowman
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
Phone: (202) 393-8690
Fax: (202) 237-3622
Email: saden@ADFlegal.org

Kevin Theriot, Esq.  *Pro hac vice*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ  85260
Phone: (480) 444-0020
Fax: (480) 444-0028
Email: ktheriot@ADFlegal.org

Michael J. Tierney, Esq.
WADLEIGH, STARR & PETERS, PLLC
95 Market Street
Manchester, NH 03101
Phone: (603) 669-4140
Fax: (603) 669-6018
Email:  mtierney@wadleighlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September, 2016, I electronically filed Plaintiffs'

Memorandum of Law in support of their Motion for Preliminary Injunction with the Clerk of the

Court using the CM/ECF system, which will send notifications of such filing to and serve the

following NEF parties:

Bridget Asay
BAsay@atg.state.vt.us

Benjamin Battles
Benjamin.battles@vermont.gov

Michael Tierney
mtierney@wadleighlaw.com

Kevin Theriot
ktheriot@ADFlegal.org

Matthew S. Bowman
mbown@ADFlegal.org

Dated this 26th day of September 2016.


By:

____/s/ Steven H. Aden_____
Steven H. Aden *Pro hac vice*
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
Phone: (202) 393-8690
Fax: (202) 237-3622
Email: saden@ADFlegal.org