UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 APR -5 PM 2:34

BY_____
DEPUTY CLERK

| | |
|---|---|
| VERMONT ALLIANCE FOR ETHICAL HEALTHCARE, INC.; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS, INC., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Case No. 5:16-cv-205 |
| WILLIAM K. HOSER, in his official capacity as Chair of the Vermont Board of Medical Practice; MICHAEL A. DREW, M.D., ALLEN EVANS, FAISAL GILL, ROBERT G. HAYWARD, M.D., PATRICIA HUNTER, DAVID A. JENKINS, RICHARD CLATTENBURG, M.D., LEO LECOURS, SARAH McCLAIN, CHRISTINE PAYNE, M.D., JOSHUA A. PLAVIN, M.D., HARVEY S. REICH, M.D., GARY BRENT BURGEE, M.D., MARGA S. SPROUL, M.D., RICHARD BERNSTEIN, M.D., DAVID LIEBOW, D.P.M., in their official capacities as Members of the Vermont Board of Medical Practice; JAMES C. CONDOS, in his official capacity as Secretary of State of Vermont; and COLIN R. BENJAMIN, in his official capacity as Director of the Office of Professional Regulation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER RE: DEFENDANTS' MOTION TO DISMISS AND
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(Doc. 31 and 32)**

This lawsuit is filed by physicians and other health providers who seek to enjoin the state,

including the Vermont Board of Medical Practice and the Office of Professional Regulation,

from taking any professional disciplinary action against them arising from the provisions of

Vermont's Patient Choice and Control at End of Life Act (Act 39) (18 V.S.A. §§ 5281–5293),

Vermont's informed consent statute (12 V.S.A. § 1909), and the Vermont Patient's Bill of Rights

(18 V.S.A. § 1871). Defendants move to dismiss the plaintiffs' complaint for lack of subject

matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim

for which relief may be granted under Rule 12(b)(6). (Doc. 31 at 1.) The court heard argument

on the motion on November 8, 2016. (Doc. 46 (transcript).)

## Background

The following facts are drawn from the Plaintiffs' complaint. In 2013, Vermont enacted

Act 39. 18 V.S.A. §§ 5281–5293. The Act authorizes physicians to prescribe a lethal dose of

medication to terminally-ill Vermonters who meet certain conditions and wish to end their lives.

(Doc. 1 ¶ 42.) The passage of Act 39 was controversial because suicide, even for the terminally

ill, is anathema for many people, especially those holding traditional religious beliefs. For

others, Act 39 represents a validation of personal autonomy consistent with their moral beliefs.

As this case demonstrates, the dispute over assisted suicide, now permitted in five states and the

District of Columbia, is far from over.[1]

---

[1] Physician assistance in ending life is now permitted by statute in four states and the District of Columbia and by judicial decision in Montana. Oregon was the first state to pass a physician-assisted suicide law in 1994 through a ballot initiative. Oregon Death with Dignity Act, ch. 3, 1995 Or. Laws 12–15 (codified as amended at Or. Rev. Stat. §§ 127.800–127.897 (2015)). Although it had banned the practice in the 1990s, *see Washington v. Glucksberg*, 521 U.S. 702 (1997), Washington followed Oregon with a similar ballot initiative in 2008. Washington Death with Dignity Act, ch. 1, 2009 Wash. Sess. Laws 1–12 (codified as amended at Wash. Rev. Code §§ 70.245.010–70.245.903 (2016)). Vermont was the first state to authorize the practice through legislation in 2013. Vermont Patient Choice and Control at End of Life Act, No. 39, 2013 Vt. Acts & Resolves 292–296. California also authorized the practice through legislation in 2015. California End of Life Option Act, ch. 1, 2015 Cal. Legis. Serv. 2nd Ex. Sess. 6103–6123 (codified as amended at Cal. Health & Safety Code §§ 443–443.22 (West 2016)). The District of Columbia authorized the practice through vote of the D.C. Council and signing by the Mayor in 2016. D.C. Death with Dignity Act, 63 D.C. Reg. 15697–15707 (Dec. 23, 2016) (codified as amended at D.C. Code §§ 7-661.01 to 7-661.17 (2017)). In 2009,

Plaintiffs are two medical organizations, one Vermont-based and the other national, whose members are opposed to physician-assisted suicide for religious and ethical reasons. These members include doctors, nurses, pharmacists and other licensed health-care providers. (Doc. 1 ¶¶ 6–7, 10, 12.)  Plaintiffs seek an injunction against the members of the Vermont Board of Medical Practice, the Vermont Secretary of State, and the Office of Professional Regulation enjoining defendants from initiating disciplinary proceedings or other criminal or civil action which might arise from a refusal to inform patients of the choices available under Act 39. (Doc. 1 at 31, ¶ 7.)  Plaintiffs claim that unless their religious principles are protected, their members will be forced to leave Vermont to practice in states that have not enacted similar legislation.  (Doc. 1 ¶ 13.)

Plaintiffs do not claim that any disciplinary action has been taken against their members. (*See* Doc. 39 at 5.)  Rather, by declaration, the plaintiff organizations have identified two physicians, a nurse, and a pharmacist (not identified by name) who fear such action will occur in the future.  (Doc. 1 ¶¶ 14–18.)  Although the plaintiffs recognize that Act 39 includes explicit protection for physicians who elect not to participate in assisted suicide, they allege that Defendants have adopted an "expansive reading" of Act 39 requiring "all healthcare professionals to counsel for assisted suicide."  (Doc. 1 ¶¶ 2–3.)

Plaintiffs make claims under the First Amendment (both free speech and free exercise of religion) as well as the Fourteenth Amendment (void for vagueness).  Additionally, they claim that Defendants have violated a provision of the Church Amendments, 42 U.S.C. § 300a-7(d) and a provision of the Affordable Care Act, 42 U.S.C. § 18113, prohibiting state agencies receiving federal funds from promoting physician-assisted suicide or discriminating against those

---

the Montana Supreme Court ruled in *Baxter v. State*, 224 P.3d 1211, 1222 (Mont. 2009), that as a matter of state law, physician aid in dying did not violate public policy.

who object to the practice.  Finally, they assert free speech, free exercise and due process claims under the Vermont Constitution (Ch. I, Art.13).  They seek declaratory and injunctive relief under federal and state law.

**Analysis**

**I.      Rule 12(b)(1) Standard**

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it . . . .'"  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Where, as here, a Rule 12(b)(1) motion is "facial"—i.e., "based solely on the allegations of the complaint or the complaint and exhibits attached to it"—the plaintiff has no evidentiary burden in opposing the motion.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  The court's task is to determine whether the pleadings allege "facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue."  *Id.* (alteration in original) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  In ruling on a facial Rule 12(b)(1) motion, the court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the plaintiff.  *See id.*

**II.     Structure of Act 39**

Act 39 is primarily a grant of immunity in various forms to physicians who may prescribe lethal medication and to other health care workers such as nurses or pharmacists who assist in these cases.  *See* 18 V.S.A. § 5283(a).  Physicians and other groups receive protection from potential professional discipline, civil liability, and criminal charges for conduct that conforms to the Act's process for ensuring that a patient's decision to end his or her life is voluntary and

4

informed and that the patient's medical condition meets clinical criteria for an end-stage terminal illness. 18 V.S.A. §§ 5283–5285, 5290. The court reviews the provisions of Act 39 in detail below.

Act 39 opens with a definitional section not relevant to the issues before the court. 18 V.S.A. § 5281. The next provision, § 5282, addresses two issues. First, the provision states that a patient's right to receive information about palliative care and to disclosure of foreseeable risks and benefits of medication, assured by 18 V.S.A § 1871 and 12 V.S.A. § 1909(d) respectively, remain in effect. These rights "exist regardless of the purpose of the inquiry or the nature of the information." 18 V.S.A. § 5282. The court interprets this sentence to mean that a patient is still entitled to receive information about palliative care and about the risks and benefits of all available treatment even if he or she has inquired about assisted suicide.

The second sentence of § 5282 provides that a physician who engages in discussions about "such risks and benefits"—meaning the risks and benefits of palliative care and medication—has not engaged in "assisting in or contributing to a patient's independent decision to self-administer a lethal dose of medication." *Id.* This sentence also confers immunity on a physician who has engaged in discussion with a terminally-ill patient pursuant to 18 V.S.A § 1871 or 12 V.S.A. § 1909(d). The provision provides that "such discussions [under existing standards of informed consent] shall not be used to establish civil or criminal liability or professional disciplinary action." *Id.* That is to say, if a physician discusses the treatment options available to a patient, the physician cannot be subject to civil or criminal liability or professional disciplinary action for this discussion.

The next provision, § 5283, is the heart of Act 39. This provision confers immunity on a physician who prescribes a lethal dose of medication to a terminally-ill patient. 18 V.S.A.

§ 5283(a). To qualify for this immunity, a physician must observe the provision's precautions against providing assistance in ending life to a patient who does not qualify. These include a second opinion requirement, separate rules for written and oral requests, and other measures intended to document and ensure that the patient's choice to end her life is voluntary. *Id.* § 5283(a)(1)–(15). Section 5283 concludes by noting that the provision does not "limit civil or criminal liability for gross negligence, recklessness, or intentional misconduct." *Id.* § 5283(b).

Section 5284 relieves all providers from any duty to intervene to prevent a patient from taking a lethal dose of medication. Neither civil liability nor a criminal charge can arise "solely for being present when a patient with a terminal condition self-administers a lethal dose of medication." *Id.* § 5284.

Section 5285 provides protection to physicians and others who object to participating in assisted suicide. This provision states that no physician, nurse, pharmacist, or other person shall be under a duty to "participate in the provision of a lethal dose of medication to a patient." *Id.* § 5285. An employer cannot take action against its employees for providing lethal medication or for refusing to do so. *Id.* § 5285(b). The provision concludes by preserving civil remedies for negligence and intentional torts. *Id.* § 5285(c).

Section 5286 permits a health care facility to prohibit its physicians from writing prescriptions for lethal medication intended for terminally-ill patients in residence. *Id.* § 5286. This provision authorizes an entire hospital, such as a religiously-based institution, to opt out of participating in assisted suicide. *Id.*

Section 5287 removes any adverse consequences for life insurance protection. *Id.* § 5287(a). The second sentence of § 5287 bars insurers from considering a physician's

6

involvement (or not) with the Act's provisions when issuing malpractice coverage. *Id.* § 5287(b).

Section 5288 excludes palliative sedation (which can also hasten death) from the statutory requirements for assisted suicide.

As originally enacted, Act 39 also contained two additional provisions, sections 5289 and 5290. Both of these provisions provided a much simpler process for establishing a voluntary, informed decision to seek physician assisted suicide. 18 V.S.A. §§ 5289, 5290 (repealed 2015). These provisions were originally intended to take effect in 2016 and would have replaced the more complicated provisions just described. Instead, the legislature repealed sections 5289 and 5290 and left the original provisions in place. *See id.* §§ 5289, 5290 (repealed 2015).

Section 5291 deals with the safe disposal of unused medication.

Section 5292 distinguishes assisted suicide, which must be the act of the patient, from "lethal injection, mercy killing, or active euthanasia," which are acts by third-parties and remain illegal. *Id.* § 5292. Additionally, § 5292 confers a final grant of immunity to providers complying with the provisions of Act 39 from other laws concerning suicide, assisted suicide, mercy killing, or homicide. *Id.* The provision also states that it shall not be construed to conflict with "section 1533 of the Patient Protection and Affordable Care Act," which prohibits discrimination against doctors or hospitals that do not engage in physician-assisted suicide or other practices. *Id.*

The court has reviewed the provisions of Act 39 in such detail because it is necessary at the outset to determine whether the Act imposes any obligation on physicians who do not choose to prescribe lethal medication or in other way participate in assisted suicide. The answer is that Act 39 does not. With no affirmative obligations under Act 39, the plaintiffs' Vermont members

7

may not need the court's protection. Certainly, based on the text of Act 39 alone, the plaintiffs' Vermont members are not at risk, even when they care for a terminally ill patient otherwise eligible for assisted suicide and fail to inform their patient because the Act contains no duty to counsel or prescribe a lethal dose of medication.

## III.    Informed Consent Provisions

The fact that Act 39 imposes no duty on the plaintiffs' Vermont members does not mean that the members have no professional obligation to counsel a patient concerning the potential availability of assisted suicide. Rather, 18 V.S.A. § 1871 and 12 V.S.A. § 1909(d) continue to govern physicians in all aspects of their care of the terminally ill. Under these provisions, physicians must inform patients about all choices and options relevant to their medical treatment. *See* 18 V.S.A. § 1871(a)–(b); 12 V.S.A. § 1909(d). These provisions apply independently from Act 39, and both are referenced within the body of Act 39 itself. *See* 18 V.S.A. § 5282. Plaintiffs fear that these informed consent provisions may create a conflict between the legal requirements of medical practice and the plaintiffs' members' personal convictions.

## IV.    Position of the State Regulators

Defendants are represented in this case by the Office of the Vermont Attorney General (the "AG"). Defendants have adopted a conservative interpretation of the reach of the informed consent laws. In the view of the AG, the life-ending measures available under Act 39 do not represent medical care and are not subject to the informed consent provision of 18 V.S.A. § 1871 (the "Patient's Bill of Rights for Palliative Care and Pain Management") or the more general informed consent provision at 12 V.S.A. § 1909(d). As the AG puts it:

> The Act 39 process is not 'palliative care" as that term is used in the patient's bill of rights—it is an option for hastening death, not medical treatment such as pain management that improves the quality of life. Nor did the Legislature deem the Act 39 process to be "terminal care" for purposes of § 1871(b). Act 39 does not

8

> give patients a "right" to "request" and "expect and receive" aid in dying from
> their health care provider, but, instead, expressly provides that health care
> providers and facilities are not obligated to participate in the Act 39 process.

(Doc. 31-1 at 10.)  The AG finds support for this position in the enactment of Act 39 *after*

passage of the "Patients' Bill of Rights" (18 V.S.A. § 1817) as well as in the provisions within

Act 39 authorizing physicians and others to decline to participate in assisted suicide.  (Doc. 31-1

at 10.)  Although the general informed consent statute, 12 V.S.A. § 1909(d), receives less

attention, it is clear from the AG's briefing that the state regulators do not interpret this statute

either as providing a basis for disciplinary action against Plaintiffs' members.

    The AG does not entirely rule out any obligation to advise patients about the availability

of assisted suicide.

> In defendants' view, physicians do have a professional obligation to ensure that
> patients who inquire about aid-in-dying or the Act 39 process receive accurate
> information.  Physicians may provide that information directly or, if they object to
> doing so, may take other steps to ensure that the patient receives information,
> through a referral to another provider, to an organization, or to written or online
> materials about the Act that are readily available to the patient.

(Doc. 31-1 at 13.)  On this issue, there is some common ground between the parties.  Plaintiffs

agree that their members may not provide false information to a patient who inquires about

assisted suicide.  (*See* Doc. 46 at 32:5–7 ("[N]o one is talking about providing untruthful or

evasive or duplicitous answers here.").)  Plaintiffs also agree that a direct question deserves an

honest answer.  (*See id.* at 38:25–39:3 ("I don't think that a good doctor would [refuse to discuss

contraception despite his or her religious objections].  And the declarations that we submitted

[concerning assisted suicide] are not talking about simply clamming up and turning around and

giving . . . the patient the cold shoulder.").)

    And Plaintiffs do not object to directing a patient to a source of information such as a

website.

> To me the patient's own cell phone is a reasonably available source of
> information. If [the state] were to get up here in a moment and say, Your Honor,
> we're willing to stipulate that all that one of [the plaintiffs' members] has to do to
> abide by the requirements of Act 39 is simply and politely tell a patient that they
> can Google assisted suicide on their cell phone and that's a reasonably available
> source of information then I think we have nothing further to talk about here.

(*Id.* at 40:13–21.) But Plaintiffs do object to being compelled to provide details about how to

obtain assisted suicide as well as any requirement that they refer a patient to another physician.

Defendants' position is that a physician who directs a patient to a website (or to another doctor or

some other reliable source of information) has satisfied any disclosure obligation.

Both sides in this case believe that a referral to a website in response to a patient's

positive inquiry is sufficient to satisfy Vermont's informed consent requirements.[2]  Plaintiffs

believe that their members can go no further than that without violating their religious principles.

From the defendants' perspective, the website is just one of several ways that a physician who

objects to physician assisted suicide may provide an appropriate response to a patient's

questions.  Others include a referral to a physician who does not object to discussing Act 39 or

directing her to other sources of information.  It is critical to an understanding of the standing

issue to recognize at the outset that the parties agree on at least one potential solution to their

shared dilemma of answering patients' questions without violating the physicians' beliefs.

Not all such conflicts between conscience and the state have lent themselves to such a

compromise.  In more authoritarian eras, the state has demanded a positive statement from its

subjects in violation of religious belief.  In his second to last letter to his daughter Margaret

Roper, Sir Thomas More described his efforts to defend himself before a panel of judges for

---

[2] The court interprets the plaintiffs' references to a website to mean a source of
information maintained by a third-party.  Obviously a patient who lacks a cell phone or does not
use the internet has the same right to information as a patient who uses a computer with ease.
The principle is that Plaintiffs describe their members as willing to answer a patient's question
about Act 39 by directing him or her to another source of information.

refusing to swear to uphold the Act of Succession which placed Henry VIII at the head of the

English church:

> For if it so were that my conscience gave me against the statutes (wherein how
> my mind giveth me I make no declaration), then I nothing doing nor nothing
> saying against the statute, it were a very hard thing to compel me to say either
> precisely with it against my conscience to the loss of my soul, or precisely against
> it to the destruction of my body.

*St. Thomas More: Selected Letters* 961 (Letter #64) (Elizabeth Frances Rogers, ed., (1961)).

More's efforts to escape conviction through conscientious silence were unsuccessful.

Plaintiffs in this case do not insist upon silence nor do they reject on grounds of

conscience all engagement with the requirements of state government. Their members are

prepared to answer a patient's inquiries about a topic which violates their own beliefs. The

answer may be limited to a direction to a website. The AG accepts such direction as legally

sufficient. Plaintiffs' concession that a dying patient should receive an answer to his question

about Act 39 distinguishes this case from the unyielding collision of faith and statute which

claimed the life of More. For purposes of the court's discussion of the standing issue, the

plaintiffs' position regarding referral to a website—a position which appears to be reasonable

and sufficient to the representative of the state—makes the likelihood of injury to its members

through initiation of a disciplinary case highly unlikely.

## V.     Standing

Article III of the Constitution limits federal jurisdiction to "Cases" and "Controversies."

U.S. Const. art. III, § 2. The courts are without authority to issue advisory opinions or decide

"purely hypothetical case[s] in which the projected harm may ultimately fail to occur." *Baur v.

Veneman*, 352 F.3d 625, 632 (2d Cir. 2003). The case and controversy requirement is most

frequently enforced through justiciability doctrines that exclude cases which are brought too

soon (ripeness), remain pending after the dispute has ended (mootness), or in some other way fail

to demonstrate that "defendant's actions have inflicted a concrete, present harm on the plaintiff." *Hedges v. Obama*, 724 F.3d 170, 188 (2d Cir. 2013). The last requirement is frequently called "standing."

The three "irreducible minimum" requirements of standing are familiar. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). These are: "(1) a concrete, particularized, and actual or imminent injury-in-fact; (2) that is traceable to defendant's conduct; and (3) likely to be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Standing doctrine derives from two sources: "constitutional requirements and prudential considerations." *Valley Forge Christian Coll.*, 454 U.S. at 471. The constitutional requirements are the mandatory elements required for federal jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The prudential considerations embody "judicially self-imposed limits on the exercise of federal jurisdiction." *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013) (internal quotation marks omitted). Both doctrines prevent courts from deciding abstract or speculative questions that do not require judicial intervention and that other government institutions could more competently address.

This case raises the constitutional type of standing issue. Prudential concerns often arise when the parties may not be truly adversarial as in *Windsor*, in which the executive branch declined to defend the constitutionality of the challenged statute. Such problems are not present here. The constitutional standing issue arises instead because as the position of the parties has developed, it is clear that they share an interpretation of what constitutes compliance with the requirements of Act 39. Because the parties share an understanding of some action which would neither violate the Plaintiffs' members religious principles nor fall short of the modest disclosure

requirement described by the AG,  the risk of actual harm to the plaintiffs through the filing of a

disciplinary case is highly remote.  Without some likelihood of injury, there is no real

controversy between the parties sufficient to meet the constitutional requirement.

The standing requirement takes on particular meaning in cases seeking to prevent the

threatened enforcement of a law on constitutional grounds.  Since Plaintiffs are not currently the

subjects of prosecution or other governmental action, they must demonstrate "[1] an intention to

engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed

by a statute, and [3] there exists a credible threat of prosecution thereunder." *Babbitt v. Farm*

*Workers Nat'l Union,*, 442 U.S. 289, 298 (1979).  If any of these elements are absent, then the

plaintiff lacks standing because he or she has not shown injury.

The Second Circuit applies "somewhat relaxed standing and ripeness rules" to pre-

enforcement First Amendment claims. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682

(2d Cir. 2013).  In *Walsh* and in *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376

(2d Cir. 2000), the court recognized standing for organizations which feared they would be

sanctioned if they failed to comply with campaign disclosure requirements to which they had

constitutional objections. "A real and imminent fear of such chilling is enough" to establish

standing. Nat'l Org. for Marriage, 714 F.3d at 689.  This standard is derived from the well-

recognized principle that a person need not suffer prosecution or other enforcement action in

order to raise a constitutional objection to a statute. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484

U.S. 383 (1988).

Even plaintiffs who allege pre-enforcement "chilling" must demonstrate a threat of injury

giving rise to the fear which deters them from exercising their rights. *Laird v. Tatum*, 408 U.S.1

(1972).  In many cases, the threat is present because the future enforcement conduct is relatively

certain as in the case of plaintiffs who refuse to answer questions on a bar application, *Baird v.*

*State Bar of Arizona*, 401 U.S. 1 (1971) or choose not to provide campaign finance information.

*Nat'l Organization for Marriage, Id.*  In such cases, the threat of enforcement in the future is

highly probable and the impact on the plaintiff's exercise of his or her rights is real.  As the

threat becomes uncertain, the likelihood of a real and imminent fear sufficient to confer standing

is diminished.

Standing in pre-enforcement cases is often analyzed as an issue of ripeness.  See *Nat'l*

*Org. for Marriage*, 714 F.3d at 688 ("Often, the best way to think of constitutional ripeness is as

a specific application of the actual injury aspect of Article III standing.")  A party who

anticipates that he will be subject to unconstitutional enforcement must satisfy the court that the

injury is imminent rather than conjectural or hypothetical.  *New York Civil Liberties Union v.*

*Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008).

The court turns to the application of these general principles to the specific allegations

made in this case.

**A.      Course of Conduct**

The first requirement for pre-enforcement standing is that Plaintiffs demonstrate that their

members intend to engage in a course of conduct which is arguably protected by the

Constitution.  The court is satisfied that this element is present.  The members seek to practice

medicine or nursing or provide pharmacy services in a manner consistent with their religious

beliefs.  These beliefs include a principled aversion to taking steps to enable or facilitate assisted

suicide.

### B.     Proscribed by Law but Protected by the Constitution

The second requirement is that the members' intended conduct is proscribed by Act 39. In other words, they must show that they have violated (or are on the point of violating) the law for reasons protected by the First Amendment.  Whether Plaintiffs can meet this standard is less certain.  The memoranda submitted by the AG take the position that Act 39 imposes no obligation to counsel or advise patients about Act 39.  But standing is not defeated just because a state agency takes a restrictive view of the law's requirements.  The court has doubts about whether it is true as a matter of law that the informed consent requirement which appears in 18 V.S.A. § 1871 and receives specific mention at 18 V.S.A. § 5282 has *no* application to Act 39.  But it is unnecessary to rule in the abstract on this issue because there can be little doubt that no likelihood of professional discipline is present.

### C.     Credible Threat of Prosecution

The briefing and oral argument on the motion to dismiss demonstrate unequivocally that there is no credible threat of prosecution of Plaintiffs' members by Vermont's medical regulators.  First, of course, there have been no known disciplinary proceedings to date over the course of three years since the passage of Act 39.  Disciplinary investigations remain private unless and until a charge is actually filed with the regulatory board so it is possible that confidential proceedings have occurred involving Plaintiffs' members or other medical professionals holding similar views.  But the Vermont medical community is not large, and it seems highly unlikely that such proceedings have occurred without the knowledge of at least one of the attorneys involved in this case.  In any event, Plaintiffs do not allege any facts suggesting any actual proceeding, public or private.

15

The prospect of imminent harm through the filing of disciplinary proceedings in the future is highly unlikely.  The parties largely agree on a solution to their dilemma which satisfies both sides.  They agree that making a false statement or ignoring a patient's inquiry is wrong.  Both agree that directing a patient to a website explaining the conditions under which assisted suicide might be available will neither violate religious principles nor fall short of the physician's obligation to provide information to the patient.  That the parties might disagree on the details of which website, how much information, or how to respond to an inquiry from a patient unable to use a computer underscores the conjectural nature of the dispute.

Standing or ripeness requirements are not present merely for purposes of disposing of cases.  They developed to protect courts from the uncertainty and potential folly of ruling on theoretical claims.  This case illustrates the problem.  In the absence of an actual enforcement action, the court is left to speculate about how a member of Plaintiffs' organizations might respond to an inquiry from a terminally ill patient and whether that response might precipitate a disciplinary proceeding.  The court runs the risk of writing an advisory opinion stating that a physician may act in one way but not in others in order to avoid any risk of professional discipline.  The spectrum of possible cases ranges from patients who ask directly about Act 39, through those who ask about all their treatment choices, and ends with those who may not ask anything at all out of fear or reluctance.  Courts are poorly equipped to act as policy advisory organizations which consider all possible problems in an area of human activity and provide guidance to "frequently asked questions."

The court concludes that Plaintiffs lack jurisdictional standing to challenge the constitutionality of Act 39 in the absence of any likelihood of imminent harm.  The case is not ripe in the sense that no enforcement action is pending now or is likely to be brought in the

16

future.[3]  The lack of standing applies across the board to all claims of constitutional violation,

both state and federal.  Dismissal without prejudice is required.  *See Carter v. HealthPort Techs.,*

822 F.3d 47 at 54 ( ("[W]here a complaint is dismissed for lack of Article III standing, the

dismissal must be without prejudice, rather than with prejudice.").

### D.    Allegations of Statutory Violations: the Church Amendment and the Affordable Care Act

Plaintiffs also seek to enforce a provision of the Church Amendments, 42 U.S.C. § 300a-

7(d) and provisions of the Affordable Care Act.  Section 300a-7(d) is one of several so-called

Church Amendments.  It excuses individuals engaged in health care or research from any

obligation to perform abortions or other procedures which may violate religious beliefs or moral

convictions.  The provision does not explicitly create a private right of action.  Nor is there an

appropriate basis for finding that Congress intended to create a cause of action by implication.

*Cenzon-DeCarlo v. Mt. Sinai Hosp.*, 626 F.3d 695, 696-97 (2d Cir. 2010).

As Defendants note, the U.S. Department of Health and Human Services has

promulgated regulations designating its Office for Civil Rights to accept and handle complaints

that federally funded health care programs have required a health care provider to engage in

actions which violate his conscience.  45 C.F.R. § 88.2.  Even if the court were to break new

ground by recognizing a private right of action, enforceable through operation of § 1983,

Plaintiffs offer no specific allegations that their members have been required to perform actions

which violate their religious conscience.  Act 39 goes to considerable lengths to avoid exactly

---

[3] Other courts have encountered the standing issue in similar circumstances. *See Lee v. State of Or.*, 107 F.3d 1382, 1391–92 (9th Cir. 1997) (claim brought by doctors challenging facial validity of Oregon's Death With Dignity Act was not ripe because the plaintiffs had not "identified any hardship that would befall them if their claims were not considered at this time"; noncompliance with allegedly offending provisions would lead, at most, to a civil enforcement action, at which time the plaintiffs could challenge the provisions' validity).

such requirements.   At most the Plaintiffs claim that their members may be subject to professional discipline for their refusal to provide information to patients about Act 39.  This is entirely different from the prohibition in § 300a-7(d), which is directed to "health service program[s] or research activit[ies]" funded with federal money and prohibits these programs from requiring staff to conduct activities which violate their conscience.

Plaintiffs also contend that 42 U.S.C. § 18113 operates to bar potential disciplinary action against them.  Section 18113, enacted as part of the Affordable Care Act, prohibits federal, state or local government or any health provider or health plan from discriminating against a person or health care entity which refuses to assist in causing the death of any person through assisted suicide or other means.  As in the case of the Church Amendments, the court lacks any basis for finding an express or implied cause of action.  The Affordable Care Act contains its own administrative remedy which is the same as the Church Amendments—designation of the Office of Civil Rights of the Department of Health and Human Services as the agency to receive complaints of discrimination.  42 U.S.C. § 18112(d).   Like the Church Amendments, § 18113 creates no individual rights.  It prohibits discrimination by public and private bodies and provides a place to complain in the event of misconduct.  The remedy is the loss of federal funding.  In the absence of an individual entitlement, there is no private right of action enforceable through § 1983.  *Gonzaga Univ. v. Doe,* 536 U.S. 273, 287 (2002).

### Conclusion

Plaintiffs' complaint fails to establish subject matter jurisdiction due to lack of standing. Accordingly, Defendants' Motion to Dismiss (Doc. 31) is GRANTED under Rule 12(b)(1).  The court declines to rule with respect to Defendants' motion to dismiss for failure to state a claim

under Rule 12(b)(6).  The case is DISMISSED WITHOUT PREJUDICE.   Plaintiffs' motion for

preliminary injunction (Doc. 32) is DENIED AS MOOT.

Dated at Rutland, in the District of Vermont, this  5th day of April, 2017.

Geoffrey W. Crawford, Judge
United States District Court